UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | | |
|---|---|---|
| KARSTEN SCHUH, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 3:11-cv-01033 **(Consolidated)** |
| Plaintiff, | ) ) | Judge Kevin H. Sharp Magistrate Judge Juliet E. Griffin |
| vs. | ) ) | <u>CLASS ACTION</u> |
| HCA HOLDINGS, INC., et al., | ) ) | CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL |
| Defendants. | ) ) ) | SECURITIES LAWS |
| | ) | <u>DEMAND FOR JURY TRIAL</u> |

# INTRODUCTION

1.      This is a securities class action brought on behalf of all persons who acquired the common stock of HCA Holdings, Inc. ("HCA" or the "Company") traceable to a false and misleading Registration Statement and Prospectus (collectively the "Registration Statement") utilized in connection with HCA's March 9, 2011 initial public offering (the "Class"). This case is brought against HCA, its board of directors, the investment banks which underwrote HCA's initial public offering and Hercules Holding II, LLC, an entity owned and controlled by private equity firms which have controlled HCA since it was taken private in November 2006 and involves defendants' sale of more than $4.3 billion of HCA common stock to Lead Plaintiff and the Class at a price of $30 per share.[1] The action asserts strict liability claims brought under §§11, 12(a)(2) and 15 of the Securities Act of 1933 (the "1933 Act" or the "Securities Act").

# SUMMARY OF THE ACTION

2.      HCA was founded in 1968. The Company owns, manages, or operates hospitals, freestanding surgery centers, diagnostic and imaging centers, radiation and oncology therapy centers, rehabilitation and physical therapy centers, and various other facilities. The Company's general acute care hospitals provide medical and surgical services, including inpatient care, intensive care, cardiac care, diagnostic services, and emergency services, as well as outpatient services, which include outpatient surgery, laboratory, radiology, respiratory therapy, cardiology, and physical therapy. HCA's psychiatric hospitals offer therapeutic programs, such as child, adolescent, and adult psychiatric care, and adult and adolescent alcohol and drug abuse treatment and counseling.

---

[1]      57.4 million shares were sold by existing HCA shareholders, including defendant Hercules Holding II, LLC ("Hercules"), which itself sold more than 56 million shares for proceeds of $1.62 billion.

733165_1

3. In early 2011, defendants filed a Registration Statement with the Securities and Exchange Commission ("SEC") in connection with the planned sale of HCA common stock to the public. That Registration Statement was declared effective by the SEC on or about March 9, 2011. The Registration Statement used by defendants to sell more than $4.3 billion of HCA stock in the March 2011 initial public offering ("IPO") was false and misleading as it omitted material facts, including:

(a) That at the time of the IPO HCA's Medicaid Revenue was suffering from adverse trends, which trends were reasonably expected to continue to trend unfavorably for 2011 due to impending cuts to Medicaid payments in Florida and Texas;

(b) That at the time of the IPO, HCA was suffering from declining trends in HCA's Medicaid Revenue, including declines in Texas Supplemental Medicaid Revenue[2] and Medicaid Revenue per admission[3];

(c) That in late 2010 and early 2011, HCA's Medicare Revenue was suffering from declining demand for cardiovascular and other high margin services due to physician attrition and changes in Medicare regulations;

---

[2] Approximately 35% of HCA's Medicaid revenue consisted of supplemental Medicaid payments pursuant to UPL programs in the state of Texas. *See* ¶¶41-43 for further detail. HCA described the supplemental payments as payments to hospitals in Texas for Medicaid services rendered, including payments to hospitals for providing indigent care within the UPL established by federal regulation.

[3] Revenue per admission was a financial metric closely monitored by defendants prior to and during the class period. As used herein, it is defined as Total Medicaid Revenue during a given period divided by Total Medicaid Equivalent Admissions during that same period. *See* ¶¶39-40 for further detail.

733165_1

(d)     That HCA tracked the adverse impact these negative trends were having on the Company's 2011 financial performance, which adverse trends were resulting in poorer than expected performance at the time of the IPO; and

(e)     That HCA had improperly accounted for as recapitalizations, two major reorganization transactions it had consummated prior to the IPO which had the effect of overstating HCA's reported earnings by $790 million, as the Company was able to avoid taking significant charges, including substantial depreciation and amortization charges, which would have negatively impacted its 2010 earnings.  In both instances, HCA should have accounted for the transaction as an acquisition using the purchase accounting method set forth in Statement of Financial Accounting Standards ("SFAS") No. 141, *Business Combinations*, but instead used the functional equivalent of a pooling-of-interests method.  The Financial Accounting Standards Board eliminated the pooling-of-interests method of accounting for business combinations in 2001 in order to improve the quality of information provided to investors and users of financial statements.

4.     By October 3, 2011, HCA's stock had declined to $18.81, a decline of over $11 per share or 38% from the IPO offering price, inflicting more than $1 billion of harm on Lead Plaintiff and the Class who purchased HCA stock pursuant and traceable to the false and misleading Registration Statement and suffered substantial economic loss as a result of their purchases of HCA stock.

## JURISDICTION AND VENUE

5.     The claims asserted herein arise under and pursuant to §§11, 12 and 15 of the 1933 Act [15 U.S.C. §§77k, 77l(a)(2) and 77o].

6.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the 1933 Act.

7. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because defendants maintain an office in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

8. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

9. Lead Plaintiff New England Teamsters & Trucking Industry Pension Fund acquired the common stock of HCA pursuant or traceable to the IPO, as set forth in its Private Securities Litigation Reform Act certification, and has been damaged thereby.

10. Defendant HCA is a non-governmental hospital operator and integrated provider of healthcare and related services. HCA is headquartered in Nashville, Tennessee. HCA operates acute care hospitals, outpatient facilities, clinics and other patient care delivery settings. HCA operates hospitals in the United States and the United Kingdom.

11. Defendant Richard M. Bracken serves as Chairman of the Board and Chief Executive Officer of HCA. Bracken signed the false and misleading Registration Statement.

12. Defendant R. Milton Johnson serves as President, Chief Financial Officer and a director of HCA. Johnson signed the false and misleading Registration Statement.

13. Defendant Christopher J. Birosak serves as a director of HCA. Birosak signed the false and misleading Registration Statement.

14. Defendant John P. Connaughton serves as a director of HCA. Connaughton signed the false and misleading Registration Statement.

15. Defendant James D. Forbes serves as a director of HCA. Forbes signed the false and misleading Registration Statement.

- 4 -

16. Defendant Kenneth W. Freeman serves as a director of HCA. Freeman signed the false and misleading Registration Statement.

17. Defendant Thomas F. Frist, III serves as a director of HCA. T. Frist signed the false and misleading Registration Statement.

18. Defendant William R. Frist serves as a director of HCA. W. Frist is the brother of T. Frist. W. Frist signed the false and misleading Registration Statement.

19. Defendant Christopher R. Gordon serves as a director of HCA. Gordon signed the false and misleading Registration Statement.

20. Defendant Michael W. Michelson serves as a director of HCA. Michelson signed the false and misleading Registration Statement.

21. Defendant James C. Momtazee serves as a director of HCA. Momtazee signed the false and misleading Registration Statement.

22. Defendant Stephen G. Pagliuca serves as a director of HCA. Pagliuca signed the false and misleading Registration Statement.

23. Defendant Nathan C. Thorne serves as a director of HCA. Thorne signed the false and misleading Registration Statement.

24. The defendants referenced above in ¶¶11-23 are referred to herein as the "Director Defendants."

25. Defendants Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"); Citigroup Global Markets, Inc. ("Citigroup"); and J.P. Morgan Securities LLC ("JP Morgan") acted as lead underwriters of the IPO, and participated in the drafting and/or dissemination of the Registration Statement as well as the sale of more than $4.3 billion of HCA stock to Lead Plaintiff and the Class.

- 5 -

26. Defendants Barclays Capital Inc.; Credit Suisse Securities (USA) LLC; Deutsche Bank Securities Inc.; Goldman, Sachs & Co.; Morgan Stanley & Co. Incorporated; Wells Fargo Securities, LLC; Credit Agricole Securities (USA) Inc.; Mizuho Securities USA Inc.; RBC Capital Markets, LLC; RBS Securities Inc.; SMBC Nikko Capital Markets Limited; SunTrust Robinson Humphrey, Inc.; Avondale Partners, LLC; Robert W. Baird & Co. Incorporated; Cowen and Company, LLC; CRT Capital Group LLC; Lazard Capital Markets LLC; Leerink Swann LLC; Morgan Keegan & Company, Inc.; Oppenheimer & Co. Inc.; Raymond James & Associates, Inc.; Susquehanna Financial Group, LLP; Samuel A. Ramirez and Company, Inc.; The Williams Capital Group, L.P.; Muriel Siebert & Co., Inc.; Loop Capital Markets L.L.C.; Gleacher & Company Securities, Inc.; CastleOak Securities, L.P.; Sanford C. Bernstein & Co., LLC; and Caris & Company, Inc. each acted as underwriters of the IPO, and participated in the drafting and/or dissemination of the Registration Statement as well as the sale of more than $4.3 billion of HCA stock to Lead Plaintiff and the Class.

27. The defendants referenced in ¶¶25 and 26 are referred to collectively as the Underwriter Defendants.

28. Defendant Hercules is owned and controlled by a private investor group, including affiliates of Bain Capital, Kohlberg Kravis Roberts Co. L.P. and the private equity arm of defendant Merrill Lynch. Hercules sold 56,149,719 shares as part of the IPO. As detailed in the Registration Statement, Hercules controlled HCA both before and after the IPO. Specifically, the Registration Statement admits that: "We are controlled, and after this offering is completed will continue to be controlled, by" Hercules. The Registration Statement goes on to note that as of February 11, 2011, Hercules "owned approximately 96.8% of [HCA's] outstanding common stock." In addition, the Registration Statement admits that HCA's "Board of Directors currently consists of thirteen directors, who are each managers of Hercules."

29. Defendant HCA and the Director Defendants who signed the Registration Statement are strictly liable for the false and misleading statements incorporated into the Registration Statement. Each of the Underwriter Defendants are likewise liable as they acted as part of the Underwriting Syndicate which drafted and disseminated the offering documents in connection with the IPO and were paid more than $137 million in connection therewith. The Underwriter Defendants were responsible for ensuring the completeness and accuracy of the various statements contained in, or incorporated by reference into, the Registration Statement.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE IN CONNECTION WITH THE IPO

30. On or about March 9, 2011, the SEC declared effective HCA's Form S-1/A Registration Statement and Prospectus for the IPO (collectively the "Registration Statement") and pursuant thereto defendants sold 145.1 million shares or over $4.3 billion of HCA common stock to Lead Plaintiff and members of the Class at $30 per share.

31. As defendants acknowledged in the Registration Statement, a "significant portion" of HCA's revenue is derived from government health care programs, principally Medicare and Medicaid. Specifically, HCA acknowledged that it "derived 40.7% of our revenues from the Medicare and Medicaid programs in 2010." Moreover, at the time of the IPO, Texas and Florida were by far the Company's two most important markets representing 51% of HCA's 2010 revenue.

32. The Registration Statement was false and misleading at the time it was declared effective on March 9, 2011. The true facts which then existed and were either known by or available to defendants are detailed in ¶¶33-53 herein and, include:

(a) That the historical trend of continuing growth in HCA's reported Medicaid Revenue had not only stopped but, in fact, had reversed and was trending downward and was reasonably expected to continue trending downward throughout 2011 as the result of impending Medicaid cuts in Florida and Texas;

- 7 -

(b)     That HCA's Medicaid Revenue per admission had shifted from a pattern of continued growth and was in fact declining as detailed in ¶¶39-40 herein;

(c)     That boilerplate "risk disclosures" utilized in the Registration Statement were also misleading as detailed in ¶¶49-53 as they omitted that HCA's Medicaid Revenue, Medicaid Revenue per admission and Texas Supplemental Medicaid payments were trending downward, a notable end to and reversal of a multi-year trend of growth in both Medicaid Revenue and Texas Supplemental Medicaid payments;

(d)     Impending Medicaid funding cuts for 2011 in Florida and Texas (which together generated over half the Company's consolidated revenues for the year ended December 31, 2010), were reasonably expected to materially impact HCA's 2011 performance. By early 2011, defendants were aware of the fact that Florida was enacting massive Medicaid cuts that would reduce payments to hospitals and Texas' proposed budget issued in January 2011 was to cut Medicaid provider rates (what hospitals are paid) significantly. Defendants were aware that many of these cuts were scheduled to go into effect by mid-2011 and HCA internal staff had assessed the adverse impact on the Company's 2011 and 2012 results;

(e)     HCA reported experiencing continuing positive Medicaid Revenue growth during the periods leading up to the IPO, growing by $283 million in 2009 and growing by $271 million in 2010, as described on page F-10 of the Registration Statement. However, by the IPO, HCA's strong positive Medicaid Revenue growth trend had turned negative;

(f)     That HCA had experienced a dramatic negative change in the growth trend for Texas Supplemental Medicaid Payments. For 2008-2010, HCA had experienced continued positive growth in Texas Supplemental Medicaid Payments which had rapidly grown by $212 million in 2009 and another $183 million in 2010. The Registration Statement, however, omitted the dramatic

- 8 -

reversal in HCA's Texas Supplemental Medicaid Payments, which trend had shifted prior to the IPO from strong growth to a *decline*, as detailed in ¶¶41-43 herein;

(g)     That certain of HCA's high margin Medicare Revenue components were declining, including high margin surgical procedures at HCA facilities such as cardiology, orthopedics and Obstetrics and Gynecology as a result of physician attrition and physician departures, as detailed in ¶¶44-46 herein;

(h)     The Company had improperly accounted for its prior business combinations in violation of Generally Accepted Accounting Principles, causing its financial results to be materially misstated;

(i)     The Company had failed to maintain effective internal controls concerning its accounting for business combinations as detailed in ¶¶47-48 herein; and

(j)     That as a result of (a)-(i) above, the Registration Statement, including the Company's past results detailed therein, provided investors with a distorted picture of the Company's potential growth and were not indicative of HCA's future operations.

**The omission of HCA's Medicaid Revenue Trends
Violated the SEC MD&A Disclosure Rules**

33.     Declining Medicaid Revenue represented a distinct reversal in a historical trend of increasing Medicaid Revenue. These changing trends – both the end of the historical positive trend and the emergence of a new downward trend – were required to be disclosed in the Management's Discussion and Analysis ("MD&A") section of the March 9, 2011 Registration Statement.

34.     Regulation S-K Item 303(a)(3)(ii) (and Instruction No. 3 to Paragraph 303(a)) requires companies to:

> *Describe any known trends* or uncertainties *that have had or that the registrant reasonably expects will have a material* favorable or *unfavorable impact on net sales or revenues* or income from continuing operations.

- 9 -

*     *     *

***The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results.***[4]

35.     In fact, the SEC has stated that "Disclosure is mandatory where there is a known trend or uncertainty that is ***reasonably likely*** to have a material effect on the registrant's financial condition or results of operations."

36.     As of the effective date of the Registration Statement, defendants "***reasonably expect***[***ed***]" the recent (as of March 2011) downward trend in Medicaid Revenue to have a "***material . . . unfavorable impact on . . . revenues***" going forward especially in light of the mounting state Medicaid cuts described above.  Further, the recent downward  trend in Medicaid Revenue was certain to "***cause reported financial information***" contained in the Registration Statement to "***not . . . be . . . indicative of future operating results***."  However, as described in detail below, HCA violated SEC disclosure rules, notably Regulation S-K Item 303(a)(3)(ii), in its Registration Statement by presenting  a positive trend of increasing Medicaid Revenue without any disclosure that this trend had, and would continue to, abruptly reverse in 2011.

37.     As shown in the chart below, the Registration Statement presented impressive year over year growth in Medicaid Revenue (through December 31, 2010).  HCA disclosed a trend in which Medicaid Revenue had increased by almost 40% from $1.4 billion in fiscal year 2008 to $2 billion in fiscal year 2010.

---

[4]     Here, as elsewhere, emphasis has been added, unless otherwise noted.

- 10 -

**(1) Trend as Disclosed in Registration Statement**



***By the effective date of the IPO, that trend had abruptly halted and had commenced a downward trend***.

38.     Because the Registration Statement failed to include any disclosures as to the known changing trend in Medicaid Revenue, investors were surprised as HCA's Medicaid Revenues fell sharply in 2011.  The positive trend as of December 31, 2010, disclosed in the Registration Statement was in no way indicative of HCA's future operating results.  To the contrary, the undisclosed downward trends already existed as of the date of the IPO.  Finally, as a result of the state Medicaid cuts described above and the already present downward trend in Medicaid Revenues as of the date of the IPO, it was reasonably apparent that the downward trend would continue throughout 2011.

39.     **Revenue Per Admission**.  The trend in other Medicaid financial metrics over the same period further confirms this material downward trend.  For example the relationship of ***Medicaid Admissions vs. Medicaid Revenue*** had changed dramatically as of the Effective Date of the Registration Statement.  The trend disclosed in the Registration Statement (based on financial results through December 31, 2010) showed that HCA had experienced an increase in Medicaid admissions with a corresponding increase in Medicaid Revenue over multi-year period leading up to

- 11 -

its IPO in March 2011. However, the actual trend as of the IPO had reversed, and Medicaid Revenues were declining even as Medicaid admissions continued to increase.

40. The alarming trend of declining Medicaid Revenue despite increasing Medicaid admissions is also reflected in the severe deterioration of Medicaid Revenue per admission beginning in early 2011 as illustrated by the charts below. HCA used revenue per admission metrics internally and when describing its operating results to investors, stating that HCA pays "***close attention to a number of performance measures and operational factors. . . . To monitor these variables, we use a variety of metrics, including . . . revenue per equivalent admission***." Because one of the primary objectives of the MD&A is "***to give the investor an opportunity to look at the company through the eyes of management***," the SEC placed emphasis on including disclosures in the MD&A regarding internally followed financial metrics.[5]

### Trend as disclosed in prospectus



### Macro view of undisclosed trend



41. **Texas Medicaid Supplemental UPL Payments** Similar to the other trends described above, the positive trend presented in the Registration Statement for Texas Supplemental Medicaid Payments did not reflect the actual downward trend that had occurred by the date of the

---

[5] Securities Act Release Nos. 83-8056; 34-45321 (Jan. 23, 2002) (citing fn. 6 Securities Act Release No. 6711 (April 17, 1987), Concept Release on Management's Discussion and Analysis of Financial Condition and Results of Operations, 52 FR 13715).

- 12 -

IPO; failed to reveal to investors that HCA's reported results were not indicative of its future operating results; and failed to disclose declining supplemental payments derived from the Texas Medicaid system.

42. In 2010, the ***Texas Medicaid Supplemental UPL payments*** represented approximately 35% of HCA's total Medicaid Revenue. In addition to boosting HCA's revenue, these payments were also extremely profitable to HCA. A 2011 news article quoted an HCA analyst who commented on the importance of the supplemental payments to HCA's bottom line: "***The money at stake is especially profitable to HCA, said Thomas Gallucci, a senior analyst at Lazard Capital Markets, because it comes on top of normal Medicaid payments. Gallucci provided data reported by HCA showing that, of the $657 million in 2010 supplemental payments from the state of Texas, $303 million were profits***."

43. Because of the significance of these supplemental payments, HCA separately disclosed the amount of these payments in its quarterly and annual financial statements. As was the case with overall Medicaid Revenue, HCA presented an impressive year over year growth in these highly profitable Medicaid payments in the Registration Statement. HCA disclosed a trend in which Texas Medicaid supplemental payments increased from just $262 million in fiscal year 2008 to more than $650 million in fiscal year 2010 – 150% greater than 2008. However, the trend reversed into a severe downward trend prior to the IPO. Because the Registration Statement provided financial information only as of December 31, 2010 and because HCA failed to include any disclosures as to the trend in Texas Supplemental Medicaid Revenue that existed as of March 9, 2011 investors were surprised when these revenues fell sharply for the remainder of 2011. The positive trend through December 31, 2010 contained in the Registration Statement was not in any way indicative of HCA's future results. As a result, SEC Disclosure rules required defendants to disclose these changing trends in the MD&A section of the Registration Statement.

- 13 -

**Declining High Margin Medicare Revenue Components**

44.     The Registration Statement failed to disclose that certain high margin components of HCA's Medicare Revenue were deteriorating and that this was having a material effect on HCA's financial performance.  This deterioration was caused in substantial part by a number of events which HCA later admitted.  For example, a Regulatory change with respect to the "72 hour rule" (effective June 30, 2010), which prevented HCA from receiving payment for both inpatient and outpatient services provided within 72 hours of one another and CT scan reimbursement reductions that were effective January 1, 2011, both contributed materially to the deterioration.

45.     Furthermore, overall demand for high margin services, including cardiovascular services, which accounted for approximately 25% of HCA Medicare inpatient revenues, was declining about 3% per year prior to the IPO due in part to physician attrition and a Department of Justice ("DOJ") investigation of Implantable Cardioverter Defibrillator implants that was known to defendants before the IPO.  The cardiovascular service line was very important to HCA because it "carries a better-than-average profitability," and as HCA has admitted, substantial numbers of cardiology doctors had left for competitor hospitals.

46.     Prior to the IPO, high revenue generating specialists were also leaving HCA hospitals because they were unhappy with HCA, because of cuts to government programs and because competitors were extending better offers.  The loss of these specialists contributed to the declining high margin revenue components.

**Improper Accounting Under SFAS 141**

47.     Prior to its going public in March 2011, HCA went through two major reorganization transactions.  The first transaction occurred in November 2006 when the Company was taken private by a group of private-equity funds.  The second transaction occurred in November 2010 when the private-equity funds reorganized ownership of the Company with HCA acquiring the business in

- 14 -

order to prepare the Company to go public once again. In both instances, HCA should have accounted for the transaction as an acquisition using the purchase accounting method set forth in SFAS No. 141, *Business Combinations*. Instead, HCA opted to use what is the functional equivalent of a pooling-of-interests method. The Financial Accounting Standards Board eliminated the pooling-of-interests method of accounting for business combinations in 2001 in order to improve the quality of information provided to investors and users of financial statements. By using this prohibited method, HCA materially overstated its reported earnings, as the Company was able to avoid taking significant charges, including substantial depreciation and amortization charges, which would have negatively impacted its earnings.

48. HCA emphasized its 2010 (and prior years) financial information in the Registration Statement and, according to a nationally recognized expert, if HCA had applied the proper accounting treatment, HCA's pretax earnings in 2010 would have been slashed by $790 million, or a 35%-plus reduction.

**HCA's Boilerplate Risk Disclosures
Were False and Misleading**

49. HCA's boiler plate "risk disclosures" in the Registration Statement were themselves false and misleading as they were nearly identical to those contained in prior SEC filings predating the adverse trends at issue in this case. These boilerplate "risk disclosures" were false and misleading as "[c]hanges in government health care programs" were already, as of the IPO, adversely impacting Medicaid Revenue trends reported in the Registration Statement.

50. The alleged risk disclosures that assert that changes in government health programs "*may*" reduce HCA's revenues, also in no way alerted investors to the negative change in trend that *had already occurred* in Medicaid Revenues; Texas Supplemental Medicaid Payments; and/or Medicare Case Mix. In fact, the boilerplate disclosures contained in the Registration Statement were

- 15 -

nearly identical to those contained in HCA's March 1, 2010 10-K, a filing that pre-dated the negative change in trends addressed above.

51. On July 25, 2012, HCA was forced to significantly decrease its 2011 and 2012 earnings guidance, in large part because of the continuing *decline* in Medicaid Revenue which trend had commenced prior to the IPO. This decline was a direct result of the Medicaid cuts described above. In fact, HCA was suffering from a significant reversal in the growth trend in Medicaid Revenue despite the fact that Medicaid admissions continued to increase. Overall, Medicaid Revenues declined by 6% during 2011 despite a greater than 5% increase in the number of Medicaid admissions.

52. Financial analysts and investors were surprised by the disappointing earnings and did not get adequate answers from HCA. Even a July 26, 2011 report issued by defendant J.P. Morgan bluntly admitted that "the company has left a mystery on the table." At least one other independent analyst recognized that HCA's 2011 performance estimates had to be revised in part based on Medicaid cuts, including those in Texas and Florida.

53. HCA's stock traded at $18.81 on October 3, 2011, a nearly 38% decline from the $30 per share defendants sold it for in the IPO. Lead Plaintiff and the Class have suffered damages of more than $1 billion as a result of their purchases of HCA stock in connection with the offering.

## CLASS ACTION ALLEGATIONS

54. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired shares of HCA common stock pursuant or traceable to the Company's false and misleading Registration Statement and were damaged thereby (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times,

- 16 -

members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

55. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by HCA or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. HCA has more than 400 million shares of stock outstanding.

56. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

57. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

58. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the Registration Statement was false or misleading;

(b) whether the 1933 Act was violated by defendants' acts as alleged herein; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

59. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

- 17 -

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violations of Section 11 of the 1933 Act
### Against All Defendants except Hercules

60. Lead Plaintiff repeats and realleges each and every allegation contained above, except any allegation construed to allege fraud or intentional misconduct.

61. This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

62. Lead Plaintiff acquired HCA common stock pursuant and/or traceable to the Registration Statement.

63. The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

64. HCA is the registrant for the IPO. As issuer of the common stock, HCA is strictly liable to Lead Plaintiff and the Class for the misstatements and omissions in the Registration Statement.

65. The defendants named herein were responsible for the contents and dissemination of the Registration Statement. None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

66. By reason of the conduct herein alleged, each defendant violated §11 of the 1933 Act.

67. Lead Plaintiff and the Class have sustained damages. The value of HCA common stock has declined substantially subsequent to the IPO as a result of defendants' violations.

68. At the time of their purchases of HCA common stock, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to October 1, 2011. Less than one year has elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Lead Plaintiff filed this complaint. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time this action was commenced.

## COUNT II

**Violation of Section 12(a)(2) of the Securities Act**
**Against All Defendants**

69. Lead Plaintiff repeats and realleges each and every allegation contained above, except any allegation construed to allege fraud or intentional misconduct.

70. This Count is brought pursuant to §12(a)(2) of the Securities Act on behalf of the Class, against all defendants.

71. The Registration Statement and the Prospectus incorporated therein contained untrue statements of material fact, and omitted material facts necessary to make the statements made therein not misleading as detailed above. Defendants owed Lead Plaintiff and the other members of the Class who purchased HCA shares of common stock pursuant to the Registration Statement and the Prospectus incorporated therein the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and the Prospectus incorporated therein to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Registration Statement and the Prospectus incorporated therein as set forth above.

- 19 -

72.     Each of the defendants participated in the sale of HCA stock for financial gain by means of the Registration Statement and the Prospectus incorporated therein.

73.     Lead Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Registration Statement and the Prospectus incorporated therein at the time Lead Plaintiff acquired the Company's shares.

74.     By reason of the conduct alleged herein, defendants violated §12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Lead Plaintiff and the other members of the Class who purchased HCA common stock pursuant to the Registration Statement and the Prospectus incorporated therein sustained substantial damages in connection with their purchase of HCA common stock. Accordingly, Lead Plaintiff and the other members of the Class who hold such common stock have the right to rescind and recover the consideration paid for their shares, and hereby tender their shares to the defendants sued herein. Class members who have sold their shares of common stock seek damages to the extent permitted by law.

## COUNT III

**Violations of Section 15 of the 1933 Act**
**Against the Director Defendants and Hercules**

75.     Lead Plaintiff repeats and realleges each and every allegation contained above, except any allegation construed to allege fraud or intentional misconduct.

76.     This Count is brought pursuant to §15 of the 1933 Act against the Director Defendants and Hercules.

77.     Each of the Director Defendants and Hercules was a control person of HCA by virtue of his or her position as an owner, director and/or senior officer of HCA. The Director Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of HCA. By reason of its 96.8% ownership of HCA at the

- 20 -

time of the IPO and its complete control of HCA's Board of Directors, Hercules possessed control over HCA and the Director Defendants.

78.     Each of the Director Defendants and Hercules was a culpable participant in the violations of §11 of the 1933 Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process, which allowed the IPO to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding rescission or a rescissory measure of damages; and

E.     Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

DATED:  July 13, 2012              ROBBINS GELLER RUDMAN
                                     & DOWD LLP
                                   DARREN J. ROBBINS
                                   JAMES I. JACONETTE
                                   SCOTT H. SAHAM
                                   ROBERT R. HENSSLER JR.


                                   _____
                                       s/ Scott H. Saham
                                       SCOTT H. SAHAM

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel

BARRETT JOHNSTON, LLC
GEORGE E. BARRETT, #2672
DOUGLAS S. JOHNSTON, JR., #5782
TIMOTHY L. MILES, #21605
217 Second Avenue, North
Nashville, TN 37201-1601
Telephone: 615/244-2202
615/252-3798 (fax)
gbarrett@barrettjohnston.com
djohnston@barrettjohnston.com
tmiles@barrettjohnston.com

Liaison Counsel for Plaintiffs

733165_1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13th day of July, 2012, I served the foregoing Consolidated

Complaint for Violation of the Federal Securities Laws via the Court's Electronic Filing System on

the following:

Matthew Sweeney
John S. Hicks
Caldwell G. Collins
Baker, Donelson, Bearman, Caldwell
  & Berkowitz, P.C.
211 Commerce Street, Suite 1000
Nashville, TN 37201
615/726-5600
615/726-0464 (Fax)
msweeney@bakerdoneloson.com
jhicks@bakerdonelson.com
cacollins@bakerdonelson.com

Milton S. McGee, III
Steven A. Riley
Riley Warnock & Jacobson, PLC
1906 West End Avenue
Nashville, TN 37203
615/320-3700
615/320-3737 (Fax)
tmcgee@rwjplc.com
sriley@rwjplc.com

Everett Johnson
Michele E. Rose
J. Christian Word
Latham & Watkins, LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC  20004
202/637-1008
202/637-2201 (Fax)
everett.johnson@lw.com
michele.rose@lw.com
christian.word@lw.com

Lawrence Portnoy
Joanna Cohn Weiss
Edmund Poluinski, III
Lesley Bark
Davis Polk & Wardwell, LLP
450 Lexington Avenue
New York, NY 10017
212/450-4874
212/701-5874 (Fax)
lawrence.portnoy@davispolk.com
joanna.weiss@davispolk.com
epolub@davispolk.com
lesley.bark@davispolk.com

George E. Barrett
Douglas S. Johnston, Jr.
Timothy L. Miles
Barrett Johnston, LLC
217 Second Avenue North
Nashville, TN 37201
615/244-2202
615/252-3798 (Fax)
gbarrett@barrettjohnston.com
djohnston@barrettjohnston.com
tmiles@barrettjohnston.com

Paul Kent Bramlett
Robert Preston Bramlett
Bramlett Law Offices
P.O. Box 150734
615/248-2828
615/254-4116 (Fax)
pknashlaw@aol.com
robert@bramlettlawoffices.com

Francis A. Bottini, Jr.
Chapin Fitzgerald Sullivan & Bottini LLP
550 West C Street, Suite 2000
San Diego, CA 92101
619/241-4810
619/955-5318 (Fax)
fbottini@cfsblaw.com


Darren J. Robbins
James J. Jaconette
Scott H. Saham
Robert R. Henssler Jr.
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
619/231-1058
619/231-7423 (Fax)
darrenr@rgrdlaw.com
jamesj@rgrdlaw.com
scotts@rgrdlaw.com
bhenssler@rgrdlaw.com

D. Seamus Kaskela
David M. Promisloff
Adrienne O. Bell
Kessler Topaz Meltzer & Check, LLP
280 King of Prussia Road
Radnor, PA 19087
610/667-7706
610/667-7056 (Fax)
skaskela@ktmc.com
dpromisloff@ktmc.com
abell@ktmc.com



s/ Scott H. Saham
SCOTT H. SAHAM

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
Email: scotts@rgrdlaw.com