UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| KARSTEN SCHUH, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) | No. 3:11-01033
| HCA HOLDINGS, INC., et al., | ) | Consolidated Class Action
| | ) ) | Judge Sharp
| Defendants. | ) |

## MEMORANDUM

This matter is before the Court on the HCA Defendants' Motion to Dismiss (Docket No. 98).[1] The Court heard oral arguments on that Motion on April 15, 2013. Having considered those arguments, as well as the arguments raised in the briefing which has been submitted (Docket Nos. 99, 108 & 109), the Court will partially grant the motion, and deny Plaintiffs' request to amend.

## I. BACKGROUND

This is a securities class action brought on behalf of all persons who acquired common stock of HCA Holdings, Inc. ("HCA") "traceable to"an allegedly false and misleading Registration Statement and Prospectus ("Registration Statement") issued in connection with HCA's March 9, 2011, initial public offering, involving the sale of more than $4.3 billion of HCA common stock to class members. Defendants include HCA, its directors who signed the Registration Statement, the investment banks which underwrote the initial public offering, and Hercules Holdings II, LLC, the controlling shareholder of HCA.

---

[1] The Underwriter Defendants have filed a notice of joinder in that Motion (Docket No. 110).

1

HCA is headquartered in Nashville, Tennessee, and has been in existence since 1968. It owns, manages, or operates hospitals, freestanding surgery centers, diagnostic and imaging centers, radiation and oncology therapy centers, rehabilitation and physical therapy centers, and other patient care facilities, including psychiatric hospitals that provide alcohol and drug abuse treatment and counseling. As of December 31, 2010, HCA owned or operated 164 hospitals and 106 freestanding surgery centers across 20 states. A large portion of HCA's patient volume and revenue is derived from federal Medicare programs and, to a lesser extent, state Medicaid programs, particularly Texas which provides approximately 35% of HCA's Medicaid revenue.[2]

In early 2011, HCA filed a Registration Statement signed by the board of directors with the Securities and Exchange Commission ("SEC") in connection with the planned sale of HCA common stock to the public. On March 9, 2011, the SEC declared effective HCA's Registration Statement for its initial public offering of 124,000,000 shares of stock at $30 per share.

According to Plaintiffs, the Registration Statement was false and misleading because it omitted certain material facts. These alleged omissions included that (1) at the time of the Initial Public Offering, "the historical trend of continuing growth in HCA's reported Medicaid Revenue had not only stopped but, in fact, had reversed and was trending downward and was reasonably expected to continue trending downward throughout 2011 as the result of impending Medicaid cuts

---

[2] The facts are drawn from the Consolidated Amended Complaint, as well as from the offering documents which are referenced therein. See, Pfeil v. State Street Bank & Trust Co., 671 F.3d 585, 594 n.2 (6th Cir. 2012) ("even on a motion to dismiss, courts retain the discretion to take judicial notice of certain adjudicative facts under Federal Rule of Evidence 201," and "may consider written instruments incorporated into the pleading by reference"). Thus, "[i]n addition to the allegations in the complaint, the court may also consider other materials that are integral to the complaint, are public records or otherwise appropriate for the taking of judicial notice, Wyser-Pratte Mgmt. Co. v. Telxon Corp., 413 F.3d 553, 560 (6th Cir. 2005), and this includes "the full text of the SEC filings, prospectus, [and] analysts' reports," even if those documents are not attached to the Complaint." Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 360 (6th Cir. 2001).

2

in Florida and Texas"; (2) Medicaid revenue was declining even as Medicaid admissions "continued to increase," which was reflected by a "severe deterioration" of Medicaid revenue per admission "beginning in early 2011"; (3) growth in Medicaid supplemental UPL payments from Texas which "represented approximately 35% of HCA's total Medicaid Revenue" had "reversed into a severe downward trend prior to the IPO"; and (4) certain high-margin components of Medicare revenue "were deteriorating," due to a "number of events which HCA later admitted," including changes to the "72 hour rule," and a reduction in cardiovascular services which "carries a better-than-average profitability." (Docket No. 92, Amended Complaint ¶¶ 32(a); 39-46). Plaintiffs also claim HCA overstated its reported earnings by improperly accounting for its reorganization in violation of Generally Accepted Accounting Principles ("GAAP") (Id. ¶¶ 47-48).

## II. DISCUSSION

The claims are brought under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933. Section 11 prohibits misstatements and omissions in a Registration Statement, that is, the document filed with the SEC in order to register securities for sale to the public. 15 U.S.C. § 77k. Section 12 prohibits oral misstatements and omissions, or misstatements and omissions in the Prospectus which is a part of the Registration Statement. 15 U.S.C. § 77l(a)(2). "Sections 11 and 12 both impose a duty to disclose additional facts when a statement of material fact made by the issuer is misleading, and they both impose liability for failing to fulfill that duty of disclosure, as well as for misstating a material fact." J&R Mktg., SEP v. General Motors Corp., 549 F.3d 384, 390 (6th Cir. 2008). Section 15, in turn, provides secondary liability for persons who control others and attaches only "on the corporation being found liable under Section 11 or 12." Id.; see, 15 U.S.C. §77o.

"Neither scienter, reliance, nor loss causation is an element of § 11 or § 12(a)(2) claims

3

which – unless they are premised on allegations of fraud – need not satisfy the heightened particularity of Rule 9(b) of the Federal Rules of Civil Procedure" or "the heightened standards of the Private Securities Litigation Reform Act." Panther Partners, Inc. v. Ikanos Comm. Inc., 681 F.3d 114, 120 (6th Cir. 2012). Here, Plaintiffs do not allege fraud, and "'Defendants have not argued that the pleading [is] subject to Rule 9(b),'" meaning that "'notice pleading supported by facially plausible factual allegation is all that is required.'" Republic Bank& Trust Co. v. Bear Stearns & Co., Inc., 683 F.3d 236, 256 n.7 (6th Cir. 2012) (citation omitted); see, New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group PLC, 709 F.3d 109, 120 (2nd Cir. 2013) (in the absence of fraud, claims under §§ 11 & 12(a)(2) require only ordinary notice pleading); California Public Employees' Retirement Sys. v. Chubb Corp., 394 F.3d 126, 162 n.25 (3rd Cir. 2004) (collecting cases) (same). Likewise, "Section 15 claims must satisfy the minimal notice pleading requirements of Federal Rule of Civil Procedure 8, not the heightened pleading requirements of Rule 9(b) or the PSLRA as 'fraud and scienter are not necessary elements of [a section 15] claim.'" Ho v. Duoyuan Global Water, Inc. 887 F. Supp.2d 547, 562 (S.D.N.Y. 2012) (citation omitted, collecting cases); see, In re Washington Mutual, Inc. Sec., Derivative & ERISA Litigation, 259 F.R.D. 490, 504 (W.D. Wash. 2009) ("The notice-pleading standard of Rule 8(a) applies to Plaintiffs' claims under Section 15 of the Securities Act" because claims based on control person liability "do not directly touch on circumstances that constitute fraud").

Rule 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). Nevertheless, in order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)

4

(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). That is, while Fed. R. Civ. P. 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id.

A claim is plausible where "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Id. (citing Fed. Rule Civ. Proc. 8(a)(2)). In short, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. 544, 555 (2007).

Rule 8 provides the relevant standard of review, but HCA nevertheless insists that Plaintiffs are required to plead specific facts in relation to a defendant's knowledge, and cite for that position J &R Mktg. While the Sixth Circuit stated in that case that pleading a trend was "knowable" was not sufficient, it also made clear that "the text of Item 303" which sets forth the required disclosures "only requires *known* trends or *known* demands, commitments, events or uncertainties." JR Mktg. 594 F.3d at 391 (emphasis added) (quoting, 17 C.F.R. § 229.303(a)(1)). Even under Fed. R. Civ. P. 9(b) "knowledge . . . may be alleged generally," and the Court does not read JR Mktg. as imposing a heightened pleading standard with regard to knowledge.

With this backdrop, the Court turns to Plaintiffs' claims, which can be placed in two categories: the failure to disclose that which was required, and the failure to utilize GAAP.

5

## A. Failure to Disclose

"There are two accepted methods of determining whether a duty exists for the offeror to disclose certain information in the context of a public offering." J & R Mkgt., 549 F.3d at 390. "First, an offeror is duty-bound to disclose all material information required to be disclosed by statute." Id. (citing, City of Monroe Employees Ret. Sys. v. Bridgestone Corp., 399 F.3d 651, 669 (6th Cir. 2005). "Second, an offeror has a duty to disclose any additional information required to make another statement, whether required or voluntarily made, not misleading." Id. (quoting, Rubin v. Schottenstein, 143 F.3d 263, 268 (6th Cir. 1998)

Item 303(a)(3)(ii) of Regulation S-K which requires a registrant to "[d]escribe any known trends or uncertainties ... that the registrant reasonably expects will have a material ... unfavorable impact on ... revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). "According to the SEC's interpretive release regarding Item 303, the Regulation imposes a disclosure duty 'where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations.'" Panther Partners Inc., 681 F.3d at 120 (citation omitted). "To plausibly plead such a failure to disclose claim, a complaint must allege (1) that a registrant knew about an uncertainty before an offering; (2) that the known uncertainty is 'reasonably likely to have material effects on the registrant's financial condition or results of operation'; and (3) that the offering documents failed to disclose the known uncertainty." Silverstrand Inv. v. AMAG Pharm., Inc., 707 F.3d 95, 102-103 (1st Cir. 2013).

### 1. *Decline in Medicaid Revenue and Impact of Proposed Legislation*

Plaintiffs allege that, while HCA disclosed in the Registration Statement a positive trend in

6

Medicaid Revenues that existed on December 31, 2010, as of the date of the initial public offering "that trend had abruptly halted," there "already existed" a "downward trend," and this downward trend was "expected to continue trending downward throughout 2011" because of "impending Medicaid cuts in Florida and Texas." (Amended Complaint, Docket No. 92 ¶¶ 32(a) & 38). This allegation does not state a plausible claim for relief because there was no downward trend in Medicaid Revenue at the time of the initial public offering, and HCA was not required to disclose cuts that may have come about as a result of proposed legislation.

In moving to dismiss, Defendants assert that the SEC filing for the first quarter of 2011 covering January through March 2011 showed that Medicaid revenue increased and remained consistent as a percentage of total revenue compared to the same quarter in 2010, with Form 10-Q for the first quarter of 2011 showing $508 million in Medicaid Revenue and Form 10-Q for the first quarter of 2010 showing $478 million in revenue. In response, Plaintiff does not challenge these figures or the accuracy of the Form 10-Q filings.

While not addressing the apparent fact that Medicaid Revenues were not in a downward trend as of the time of the Initial Public Offering, Plaintiffs nevertheless argue that HCA was required to disclose the potential impact on revenue of proposed legislation in Florida and Texas.[3] In support of this position, Plaintiffs rely upon Helwig v. Vencor, 251 F.3d 540, 561 (6th Cir. 2001).

Helwig was not a Section 11 or 12 case based on Item 303, but a Section 10b-5 case involving alleged statements or omissions made by Vencor, a long-term health care provider focused

---

[3] The Florida Medicaid bill was not approved by the legislature, nor signed into law until months after the Registration Statement. Likewise, the Texas state budget which would cut Medicaid spending was not approved by the legislature or signed by the governor until months after the Initial Public Offering.

7

on hospital and nursing services. Months after President Clinton proposed the Balanced Budget Act which featured several Medicare provisions that would substantially affect the healthcare industry, Vencor filed its second-quarter 10-Q report in which it stated that it "could not predict whether Medicare reform proposals would be adopted by Congress 'or if adopted, what effect if any, such proposals would have on its business.'" Id. at 546. It made those representations, notwithstanding the fact that, less than a month before, executives had met with employees and gave them notice that they would be laid off in sixty days upon expected passage of the Act. Even weeks after the Act's passage, Vencor asserted that it was comfortable with its earning forecasts. Shortly thereafter, its stock declined by nearly thirty percent.

Plaintiffs argue that "[t]he facts here are analogous to those addressed by the Sixth Circuit *en banc* in Helwig, where the Court held that defendants had a duty to disclose the '**potential impact**' of **proposed legislation** on their business." (Docket No. 108 at 14, bold in original). This, however, was not Helwig's holding, and the Sixth Circuit has cautioned against deriving "expansive notion[s]" by utilizing "selective quotations" from Helwig. J & R Mktg., 549 F.3d at 394. In fact, the Sixth Circuit in Helwig made clear that "the question in this case is not whether Vencor had a duty to divulge its internal assessments of the Balanced Budget Act, but "[r]ather, the question is whether the company had a duty to complete the information already given concerning the Budget Act and earning estimates[.]" Helwig, 251 F.3d at 561. The court then held: "With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known – but it may not choose half-truths." Id.

Just as in J & R Mktg., another Section 11 and 12(a)(2) case, "[t]he difference between Helwig and [this] case is clear," because "the statement there misled investors into believing

8

something that was not in fact true," whereas "[h]ere there is no allegation regarding what falsehood the investors were misled into believing[.]" J & R Mktg., 549 F.3d at 395. Quite the contrary, HCA issued disclosures that indicated changes in governmental health programs. Those disclosures included:

> Since most states must operate with balanced budgets and since the Medicaid program is often a state's largest program, some states can be expected to enact or consider enacting legislation designed to reduce their Medicaid expenditures. The current economic downturn has increased the budgetary pressures on many states, and these budgetary pressures have resulted, and likely will continue to result, in decreased spending, or decreased spending growth, for Medicaid programs and the Children's Health Insurance Program ("CHIP") in many states. The Health Reform Law provides for material reductions to Medicaid DSH funding. Further, many states have also adopted, or are considering, legislation designed to reduce coverage, enroll Medicaid recipients in managed care programs and/or impose additional taxes on hospitals to help finance or expand the states' Medicaid systems.
>
> We operated 164 hospitals at December 31, 2010, and 74 of those hospitals are located in Florida and Texas. Our Florida and Texas facilities' combined revenues represented approximately 52% of our consolidated revenues for the year ended December 31, 2010. This concentration makes us particularly sensitive to regulatory, economic, environmental and competitive conditions and changes in those states. Any material change in the current payment programs or regulatory, economic, environmental or competitive conditions in those states could have a disproportionate effect on our overall business results.
>
> While we believe our assumptions are reasonable, it is very difficult to predict the impact of known factors, and, of course, it is impossible to anticipate all factors that could affect our actual results. These factors include, but are not limited to: . . possible changes in the Medicare, Medicaid and other state programs, including Medicaid supplemental payments pursuant to UPL programs, that may impact reimbursements to health care providers and insurers. . . .

(Docket No. 99-1 at 15, 22 & 29).

Contrary to Plaintiffs' assertion, these disclosures are hardly boilerplate. They inform potential investors that states were under budgetary pressures, that some states were expected to consider legislation to reduce Medicaid expenditures, that many states had adopted legislation

9

designed to reduce coverage, and that more than 50% of HCA's revenue was derived from Florida and Texas such that any changes in the Medicaid payment programs of those states would have a large impact on its business. Neither Section 11 which "only imposes strict liability on those who fail to include information 'required to be stated' in the registration statement," J & R Mktg., 549 F.3d at 392, nor Helwig require anything more.

### 2. Change in Medicaid Admissions versus Medicaid Revenue

Plaintiffs allege that a key metric relied upon by HCA is "the revenue per equivalent admission," and that the trend disclosed in the Registration Statement showed steady increases in that metric to December 31, 2010. However, according to Plaintiffs, what was not disclosed was that revenues per admission began a steep decline after that date, but before the initial public offering. To illustrate this claim, the Amended Complaint contains two charts, the first of which is based on HCA's SEC filing and purports to show that, for calendar year 2009, the Medicaid revenue per admission was relatively flat, but increased dramatically through the end of December 2010. The second chart which purports to be a "macro view of undisclosed trends" shows that, from the end of 2008 to the end of 2010 and, thereafter, a precipitous decline through the date of the initial public offering until the end of 2011.

HCA argues that this claim should be dismissed for any number of reasons, including that the "macro view" chart upon which Plaintiffs rely is "unsourced," there is lack of factual detail, and Plaintiffs are unable to establish a "trend." While the Court acknowledges that each of these things is of concern, Plaintiffs are only required at this point to set forth factual allegations that make the claim plausible, and they have done so, albeit with little room to spare.

HCA argues "there are no facts pled to indicate how Plaintiff came up with [the macro view]

10

chart or how it knows anything about what happened during the first nine weeks of 2011" and, "[i]ndeed, HCA does not report such information." (Docket No. 109 at 4). The latter assertion goes far beyond the pleadings as the Court does not know what HCA reports. As for the former assertion, Plaintiffs' failure to state in the Amended Complaint how the chart was derived is somewhat troublesome, but it presumably was not woven out of whole cloth and is something which can be explored during discovery.

HCA also argues that missing from the Complaint are "any actual facts showing what happened in 'early 2011,' (*i.e.*, January, February and the first nine days of March)." (Docket No. 99 at 15). However, in the absence of discovery, Plaintiffs cannot be expected to know exactly what may or may not have happened at HCA to cause the downward trend (if there was one) as "Plaintiffs' pleadings are not drafted by clairvoyants[.]" Smajlaj v. Campbell Soup Co., 782 F. Supp.2d 84, 105 (D.N.J. 2005); see, Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 596 (8th Cir. 2009) ("plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences."). It suffices for present purposes that Plaintiffs allege (and with support from a chart presumably based upon some facts) that there was a downward trend of which HCA had knowledge. The details can be fleshed out later.

Defendants also point out that only nine weeks elapsed between the earning statement of December 31, 2010, and the Registration Statement, and, relying on various cases from assorted jurisdictions, argue this short period cannot constitute a "trend" as a matter of law. As this Court observed at oral argument, however, context matters, and what may not constitute a trend in one industry may signal a trend in another. This observation is confirmed by at least one of the cases relied upon by HCA.

11

In Oxford Asset Mgmt. LTD v. Jaharis, 297 F.3d 1182 (11th Cir. 2002), the Eleventh Circuit determined that the "known trends" language of Item 303 was governed by a negligence standard, stating,

> The first element of the Item 303 disclosure test set forth in Securities Act Release 6835 requires management to assess whether the "known trend, demand, commitment, event or uncertainty [is] likely to come to fruition." Securities Act Release No. 33-6835, 1989 WL 192885 at *6 (S.E.C.). As regards trends, we <u>interpret this element to require an assessment of whether an observed pattern accurately reflects persistent conditions of the particular registrant's business environment. It may be that a particular pattern is, for example, of such short duration that it will not support any conclusions about the registrant's business environment</u>. Release 6835 states that management's assessment "must be objectively reasonable, viewed as of the time the determination is made." Id.

Id. at 1191 (emphasis added). The court went on to observe that the instructions to Item 303 provide that "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial conditions,'" and wrote:

> Item 303(a)(3)(ii) essentially says to a registrant: If there has been an important change in your company's business or environment that significantly or materially decreases the predictive value of your reported results, explain this change in the prospectus. The obvious focus is on preventing the latest reported results from misleading potential investors, thereby promoting a more accurate picture of the registrant's future prospects.

Id. at 1191-92. The Court agrees with these observations and is not prepared to conclude – as HCA requests, and as a case upon which it relies holds – that "[a]s a matter of law, a two month period of time does not establish a 'trend' for purposes of the disclosures required by Item 303." Blackmoss Invest., Inc. v. ACA Capital Holdings, Inc., 2010 WL 148617 at *10 (S.D.N.Y. Jan. 14, 2010).

### 3. *Decline in Supplemental UPL Payments from Texas*

12

Plaintiffs allege that HCA failed to disclose in its Registration Statement that Texas Medicaid Supplemental upper payment limit ("UPL") payments were declining. They claim this is significant because, not only did those payment represent approximately 35% of HCA's total Medicaid revenue, the UPLs were highly profitable. The underlying basis for the claim that HCA failed to disclose the known trend is contained in the following paragraph from the Amended Complaint:

> Because of the significance of these supplemental payments, HCA separately disclosed the amount of these payments in its quarterly and annual financial statements. As was the case with overall Medicaid Revenue, HCA presented an impressive year over year growth in these highly profitable Medicaid payments in the Registration Statement. HCA disclosed a trend in which Texas Medicaid supplemental payments increased from just $262 million in fiscal year 2008 to more than $650 million in fiscal year 2010 – 150% greater than 2008. However, the trend reversed into a severe downward trend prior to the IPO. Because the Registration Statement provided financial information only as of December 31, 2010 and because HCA failed to include any disclosures as to the trend in Texas Supplemental Medicaid Revenue that existed as of March 9, 2011 investors were surprised when these revenues fell sharply for the remainder of 2011. The positive trend through December 31, 2010 contained in the Registration Statement was not in any way indicative of HCA's future results. As a result, SEC Disclosure rules required defendants to disclose these changing trends in the MD&A section of the Registration Statement.

(Docket No. 92, Amended Complaint ¶ 43).

Unlike the last claim, which barely survives dismissal but was at least supported by a chart presumably based upon fact, the centerpiece of this claim is nothing but an entirely conclusory statement, to wit, the upward trend "reversed into a severe downward trend prior to the IPO." Id. In moving to dismiss, HCA has shown from the relevant financial statements that Texas UPL payments remained relatively constant in the first quarter of 2011 compared to the same quarter in 2010, and Plaintiffs do not challenge or otherwise contest these figures. The 2011 Q-1 Form 10-Q reported $167 million in Medicaid supplemental UPL payments from Texas compared to $169

13

million in such payments reported on the 2010 Q-1 Form 10-Q. True, this is a $2 million difference, but it is also a difference of less than 1.2% and could not portend the "severe downward departure" Plaintiffs allege. Accordingly, the Court finds that Plaintiffs have not established a plausible claim regarding Texas UPL payments.

### 4. Decline in High Margin Components

Finally with regard to disclosures, Plaintiffs allege that, at the time of the public offering, HCA was experiencing a decline in certain "high margin" components of Medicare revenue. HCA argues this allegation fails because, "Medicare revenue growth *increased* in the first quarter of 2011 compared to the same quarter in 2010," and "[i]t was not until the second quarter of 2011 that this growth declined 'unexpectedly.'" (Docket No. 99 at 20).

While "Medicare revenue growth" may have actually increased during the first quarter of 2011," that may, in fact, say nothing about high margin components of Medicare, or specific portions thereof. For example, Plaintiffs allege that overall demand for high margin services, like cardiovascular services, were declining due to physician attrition and a "DOJ investigation of Cardioverter Defribirillator implants that was known to defendants before the IPO." (Docket No. 92, Amended Complaint ¶¶ 45). In their opposition brief and incorporated request to amend, Plaintiffs further contend that, during the summer and fall of 2010, HCA conducted an internal investigation which revealed that "unlawful and highly profitable cardiac procedures had been inflating HCA's key revenue metrics and that this unlawful conduct could not be continued." (Docket No. 108 at 23).[4] This could be information "known to management that would cause

---

[4] The Court recognizes that this assertion is not specifically pled in the Complaint. It does, however, amplify what is specifically alleged, to wit, that "[t]he cardiovascular service line was very important to HCA because it 'carries a better-than-average profitability,'" and that HCA was aware of the findings of the DOJ investigation prior to the initial public offering. Regardless, this assertion underscores that there may be

14

reported financial information not to be necessarily indicative of future operating results," 17 C.F.R. § 229.303(a), and might "have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988); see, New Jersey Carpenters Health, 709 F.3d at 126 (internal citation omitted) ("Because questions of materiality are 'inherently fact-specific,' . . . 'a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'"). Accordingly, the Court will allow this claim to go forward.

## B. Violation of GAAP

Plaintiffs allege that HCA violated GAAP in accounting for two major reorganizations prior to the initial public offering. Specifically, they allege:

> 47. Prior to its going public in March 2011, HCA went through two major reorganization transactions. The first transaction occurred in November 2006 when the Company was taken private by a group of private-equity funds. The second transaction occurred in November 2010 when the private-equity funds reorganized ownership of the Company with HCA acquiring the business in order to prepare the Company to go public once again. In both instances, HCA should have accounted for the transaction as an acquisition using the purchase accounting method set forth in SFAS No. 141, Business Combinations. Instead, HCA opted to use what is the functional equivalent of a pooling-of-interests method. The Financial Accounting Standards Board eliminated the pooling-of-interests method of accounting for business combinations in 2001 in order to improve the quality of information provided to investors and users of financial statements. By using this prohibited method, HCA materially overstated its reported earnings, as the Company was able to avoid taking significant charges, including substantial depreciation and amortization charges, which would have negatively impacted its earnings.
>
> 48. HCA emphasized its 2010 (and prior years) financial information in the Registration Statement and, according to a nationally recognized expert, if HCA had

---

evidence to show that HCA had knowledge, and decided to discontinue certain practices which may have been of concern to investors.

15

applied the proper accounting treatment, HCA's pretax earnings in 2010 would have been slashed by $790 million, or a 35%-plus reduction.

(Docket No. 92, Amended Complaint ¶¶ 47-48).

HCA argues that dismissal is warranted because Plaintiffs have not pled, nor have they shown that the purchase method of accounting set forth in FAS applies to either transaction. For example, HCA argues that the "rule is obviously inapplicable to the 2006 recapitalization because HCA did not acquire" a business in that merger, as "HCA's stock was purchased from its previously public shareholder by a private group of investors after which HCA became a wholly owned subsidiary of Hercules." (Docket No. 99 at 24). HCA also argues that "the 2010 reorganization is excluded from the scope of FAS 141 because that section 'does not apply . . . a combination between entities or businesses under common control," HCA, Inc. became a wholly-owned subsidiary of HCA Holdings, Inc." and the "ownership of HCA Holdings immediately after the reorganization was exactly the same as the ownership of HCA, Inc. immediately prior to the reorganization." (Id.).

"GAAP is not the lucid or encyclopedic set of pre-existing rules that [one] might perceive it to be," Shalala v. Guernsey Mem. Hosp., 514 U.S. 87, 101 (1995), and even a most cursory review of HCA's arguments demonstrate that it is grounded on facts that may or may not be disputed. In any event, it is not a claim susceptible to resolution by way of the present motion to dismiss. See, See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1421 (3d Cir.1997) ("it is a factual question whether [the company's] accounting practices were consistent with GAAP"); In re Ambac Fin. Grp, Inc. v. Sec. Litig., 639 F. Supp.2d 241, 273 (S.D.N.Y. 2010) ("The parties' disagreements over GAAP compliance also raise issues of fact that cannot be resolved on a motion to dismiss.").

## C. Request to Amend

In the last section of their response brief, Plaintiffs "request leave to amend the Complaint

16

to incorporate additional facts . . . should the Court conclude that any of the allegations in the Complaint are not sufficient under Rule 8's liberal pleading standards." (Docket No. 108 at 23). Such facts are said to include those revealed in an August 7, 2012, NEW YORK TIMES article which stated "that during the summer and fall of 2010 HCA conducted an internal investigation that 'substantiated' allegations related to unnecessary procedures being performed in one of HCA's most profitable businesses and that the evidence confirmed that 'cardiologists at several of its hospitals in Florida were unable to justify many of the procedures they were performing.'" (Id.).

The Sixth Circuit has repeatedly held that a request to amend in a response to a motion to dismiss does not constitute a motion within the meaning of Fed. R. Civ. P. 15(a), particularly where the request does not indicated the particular ground on which amendment is sought. See, Louisiana Sch. Employees' Ret. Sys. v. Ernst & Young, 663 F.3d, 471, 486 (6th Cir. 2004); PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 699 (6th Cir. 2004). In the absence of a motion under Rule 15, the Court in its discretion may deny leave to amend because Defendants are "entitled to a review of the complaint as filed pursuant to Rule 12(b)(6)" and Plaintiffs are "not entitled to an advisory opinion from the Court informing them of the deficiencies of the complaint and then an opportunity to cure those deficiencies." Begala v. PNC Bank, 214 F.3d 776, 784 (6th Cir. 2000).

Here, Plaintiffs do not indicate which claim(s) they seek to amend, and the only new "facts" suggested are those that support a claim which the Court has allowed to go forward. Accordingly, their request to amend will be denied.

### III. CONCLUSION

On the basis of the foregoing, the Court will grant HCA's Motion to Dismiss with respect to Plaintiffs' allegations that HCA unlawfully failed to disclose (1) an adverse trend in Medicaid

17

Revenue Growth; (2) the potential impact on revenue of proposed Medicaid legislation in Florida and Texas; and (3) an adverse trend in Medicaid Supplemental UPL payments from Texas. In all other respects the Motion will be denied. Plaintiffs' request to amend will also be denied.

An appropriate Order will be entered.

*Kevin H. Sharp*
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE