UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| KARSTEN SCHUH, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 3:11-cv-01033 (Consolidated) |
| *Plaintiff*, | ) ) | CLASS ACTION |
| vs. | ) ) ) | Judge Kevin H. Sharp Magistrate Judge Juliet E. Griffin |
| HCA HOLDINGS, INC., *et al.*, | ) ) | |
| *Defendants*. | ) ) ) ) | HCA DEFENDANTS' OPPOSITION TO LEAD PLAINTIFF'S MOTION TO COMPEL |

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     PROCEDURAL HISTORY........................................................................................4

III.    THE ADDITIONAL DISCOVERY SOUGHT IS IRRELEVANT TO THE
        SURVIVING CLAIMS AND ISSUES IN THE CASE .......................................................7

IV.     JUDGE SHARP'S ORDER DOES NOT ENTITLE LEAD PLAINTIFF TO
        DISCOVERY TO DEVELOP ISSUES OR CLAIMS NOT YET IN THIS CASE..........10

V.      THE ADDITIONAL DISCOVERY SOUGHT IS OBJECTIONABLE AND
        OVERLY BROAD ...................................................................................................11

VI.     CONCLUSION........................................................................................................13

i

Pursuant to Magistrate Judge Griffin's August 5, 2013 Order (Dkt. 139) and Federal Rule of Civil Procedure 26, the HCA Defendants[1] respectfully submit this memorandum of points and authorities in opposition to Lead Plaintiff's Motion to Compel (Dkt. 141).

## I.    INTRODUCTION

Lead Plaintiff's motion reflects their third iteration of the information they seek from the HCA Defendants and creates some confusion over what documents they ask the Court to compel the HCA Defendants to produce.  In its First Set of Requests for the Production of Documents ("First Requests"), Lead Plaintiff sought seven-and-a-half years of patient and hospital level data concerning, for example, "all documents" relating to "the performance of cardiac-related procedures that were not medically necessary" and "any internal or external investigation relating to cardiovascular services."  *See* Saham Decl. Ex. 2 (Request Nos. 2 and 3).  The HCA Defendants objected to these requests on a number of grounds, including privilege, over breadth, vagueness, burden, and relevancy, and the parties met and conferred twice on those objections without reaching an agreement.

Then, in its Proposed Initial Case Management Order (Dkt. 137) and during the August 1, 2013 initial case management conference, Lead Plaintiff represented that what it wanted was four discrete categories of documents that HCA had "already" collected and/or produced to the government, that were responsive to a small number of its actual Requests.[2]  Now, the instant Motion, while ostensibly requesting production of only six narrowed categories of documents,

---

[1] The "HCA Defendants" include:  HCA Holdings, Inc. ("HCA" or the "Company"), Hercules Holdings II, LLC, ("Hercules"), Richard M. Bracken, R. Milton Johnson, Christopher J. Birosak, John P. Connaughton, James D. Forbes, Kenneth W. Freeman, Thomas F. Frist, III, William R. Frist, Christopher R. Gordon, Michael W. Michelson, James C. Momtazee, Stephen G. Pagliuca and Nathan C. Thorne.

[2] *See id.* ("As a starting point, defendants should turn over all documents relating to ● HCA's 2010 internal investigation of allegedly unnecessary procedures; ● HCA's 2010 confidential review of invasive procedures, including those done at Lawnwood; ● Documents relating to C.T. Tomlinson; and ● Documents that have already been produced to governmental investigators …").

1

actually incorporates Lead Plaintiff's first 26 Requests for production, which are exceedingly broad and overly burdensome.  *See* Saham Decl. Ex. 2.

To the extent Lead Plaintiff is seeking to compel responses to Request Nos. 1-26, it has failed to argue any basis to overrule the HCA Defendants' objections other than relevance.  *See* Saham Decl. Ex. 3.  Moreover, Lead Plaintiff's new six categories are similarly subject to valid objections.  For example, HCA's confidential investigative materials are indisputably protected by the attorney-client privilege, attorney work product doctrine, and/or peer review privileges, and the patient medical records produced to the government are likely protected by the Health Insurance Portability and Accountability Act (HIPAA), which protects the privacy of individually identifiable health information.  A large percentage of Lead Plaintiff's new six categories of documents will be covered by such privileges.

The six new categories, like Request Nos. 1-26, are also impermissibly vague.  Lead Plaintiff seeks data regarding cardiac procedures, but does not distinguish between Medicare, Medicaid, private insurance or self-paying patients.  Nor does Lead Plaintiff define what constitutes a "cardiac procedure," which could include transplants, stents, interventional procedures, vascular procedures, or any of a host of other procedures physicians employed by HCA perform across the nation involving the heart.  Pl's Mot. at 6.  Thus, no matter what relief Lead Plaintiff is actually seeking, the HCA Defendants should not be ordered to produce the documents Lead Plaintiff requests without regard to these valid objections.

Moreover, Lead Plaintiff's Request Nos. 1-26 and six categories suffer fundamental defects—they assume that the *New York Times*' description of the events reported and what documents exist are (1) correct, and (2) related to the substantive allegations in the Complaint. In essence, Lead Plaintiff is seeking a Court order compelling the production of all documents

regarding an "internal investigation," a "confidential review," and "governmental investigat[ions]" simply because the *New York Times* mentioned them and without regard to the actual substance of those events. HCA should not be compelled to produce any materials that are temporally or substantively irrelevant to Lead Plaintiff's remaining claims.

The HCA Defendants submit that Lead Plaintiff's six-category "starting point" is not the right place to start discovery at all. As stated above, Lead Plaintiff erroneously assumes not only the accuracy of the reporting by the *New York Times*, but also the relevance of the issues in its August 6, 2012 article to Lead Plaintiff's Item 303 claim regarding an alleged "trend" in high-margin Medicare revenue components known to the HCA Defendants prior to HCA's March 9, 2011 IPO. Lead Plaintiff's actual claim is set forth in a mere three paragraphs in the Complaint that have nothing to do with allegedly unnecessary cardiac procedures occurring at a few hospitals in 2010 and instead is based on HCA's July 2011 announcement of lower-than-anticipated Medicare revenue growth in the second quarter of 2011. *See* Compl. ¶¶ 44-46. The assertion that the *New York Times* allegations are the core of the case is revisionist pleading. Lead Plaintiff has no basis for its speculation that the 2010 events, reported on by the *New York Times* in August 2012, contributed to the second quarter 2011 results.

For this reason, the correct "starting point" for discovery on Lead Plaintiff's Item 303 Medicare revenue "trend" claim is the causes of the second quarter 2011 results and what the HCA Defendants knew and expected on March 9, 2011 about those causes. Despite their efforts to reframe their claims to justify a limitless search of the Company, this claim is about (and only about) Lead Plaintiff's allegation that HCA was aware of and failed to disclose a known trend in declining Medicare revenue prior to its IPO, which trend had a later impact on HCA's financial performance. Indeed its Complaint boldly states that investors were "surprised by [HCA's]

3

disappointing earnings" revealed on July 25, 2011 when HCA's second quarter results and 2011 earnings guidance were released. Compl. ¶¶ 51-52. Now Lead Plaintiff has no interest in what actually happened. If Lead Plaintiff believes that HCA was aware of some impending event that reared its head in the second quarter of 2011, any reasonable inquiry would begin with "what happened in the second quarter." The second question would be with respect to whatever happened in the second quarter, was it a known trend prior to that time requiring disclosure. If the *New York Times*' fabricated account of massive unnecessary cardiac procedures (which in fact are a small number of procedures detected and corrected by HCA) did not contribute to the decline in revenue that Lead Plaintiff alleges commenced before the IPO, then they form no part of the case. While discovery should be broad, discovery is not a search warrant and Lead Plaintiff should not be permitted to fish for a claim that is not in its Complaint.

As the HCA Defendants believe the facts will show, if unnecessary cardiac procedures did not contribute to the decline in Medicare revenue growth and no one reasonably expected these procedures to impact future revenue results at the time of the IPO (after all, there was no reported decline in high-margin Medicare revenue components prior to the IPO), Lead Plaintiff will not need the discovery it seeks in this Motion. The Motion should be denied in its entirety.

## II.    PROCEDURAL HISTORY

This case arises out of two events post-dating HCA's March 9, 2011 IPO: (1) HCA's July 25, 2011 announcement of lower-than-expected revenue growth; and (2) an article published in *Barron's* in October 2011 in which the author questioned HCA's accounting for two pre-IPO transactions. Lead Plaintiff's motion to compel concerns the former event.

Four-and-one-half months after the IPO, HCA announced, among other things, that its total revenues had increased and admissions continued to grow, but it had experienced an

4

unexpected "shift in service mix"[3] which "resulted in lower than anticipated revenue growth and earnings" in the second quarter of 2011 over the same quarter in 2010.  Dkt. 100.4, 7/25/11 Form 8-K, Ex. 99.1 at 1.  HCA was unable at that time to explain exactly what had caused these unexpected results.  After two months of additional analysis, HCA informed investors that the revenue growth decline in the second quarter of 2011, and in particular the Medicare revenue growth  decline, appeared to be driven in part by a "[s]hift in volume from surgical to medical, primarily in [HCA's] cardiovascular service line."  Dkt. 100.5, 9/12/11 Form 8-K, Ex. 99.2 at 9.[4]

Shortly after these announcements, three securities class action complaints were filed in this Court against the HCA Defendants and the underwriters of its IPO asserting, among other things, that HCA's Prospectus and Registration Statement failed to disclose that HCA knew on March 9, 2011 that it was experiencing a new trend with respect to Medicare revenue that it was required to disclose pursuant to Item 303 of Regulation S-K.  *See Schuh v. HCA Holdings, Inc.*, No. 3:11-cv-01033 (M.D. Tenn. filed Oct. 28, 2011); *Kishtah v. HCA Holdings, Inc.*, No. 3:11-cv-01098 (M.D. Tenn. filed Nov. 16, 2011); *Daniels v. HCA Holdings, Inc.*, No. 3:11-cv-01170 (M.D. Tenn. filed Dec. 12, 2011).  The cases were eventually consolidated, New England Teamsters & Trucking Industry Pension Fund was appointed Lead Plaintiff (Dkt. 81), and Lead Plaintiff filed an Amended Complaint on July 13, 2012 (Dkt. 92) ("Complaint") that continued to allege that HCA failed to disclose in its offering materials known revenue "trends" in violation of Item 303.  *Compare* Compl. ¶¶ 44-46 *with* Dkt. 100.5, 9/12/11 Form 8-K, Ex. 99.2 at 7, 13, 18.

---

[3] Put differently, while more patients were admitted to HCA's hospitals than in the same period in 2010, the services sought by those patients in 2011 were on average less complex (and thus less expensive or not "high margin"), which resulted in lower than forecasted revenue growth.

[4] Other factors included regulatory changes with respect to the billing of Medicare patients who received outpatient and inpatient services at a hospital within 72 hours (the so-called "72-hour rule") which had one-time adverse impact that quarter, and reimbursement for CT scans, which had a smaller impact.  *Id.* at 7.

5

The HCA Defendants moved to dismiss the Complaint on the grounds that, *inter alia*, Lead Plaintiff failed to plead facts showing that the events in the second quarter of 2011 had occurred or were expected to have a material future impact on HCA's revenue prior to its March 9 IPO. In support of their motion, the HCA Defendants showed that Medicare revenue growth increased in the first quarter of 2011 over the same quarter in 2010. *See* HCA Defs' Mem. ISO Mot. to Dismiss (Dkt. 99) at 19. In opposition, Lead Plaintiff requested that *if* the Court found the allegations supporting its Item 303 claims insufficient under Rule 8, Lead Plaintiff should be permitted to amend the Complaint to plead "additional facts" reported by the *New York Times* on August 6, 2012 (the "*New York Times* article"), which referenced an investigation conducted by HCA in 2010 into allegations that unnecessary procedures were being performed by cardiologists at certain hospitals in Florida. *See* Saham Decl. Ex. 1.

On May 28, 2013, Judge Sharp granted in part and denied in part the HCA Defendants' motion to dismiss the Complaint. Relevant to this motion to compel, Judge Sharp sustained Lead Plaintiff's Item 303 claim based on the HCA Defendants' failure to disclose an alleged trend in high-margin Medicare revenue components. Memorandum and Order, May 28, 2013 (Dkt. 116) ("Order") at 14 ("[W]hile 'Medicare revenue growth' may have actually increased during the first quarter of 2011,' that may, in fact, say nothing about high margin components of Medicare, or specific portions thereof."). However, Judge Sharp denied Lead Plaintiff's request for leave to amend to add the *New York Times* facts. *Id.* at 17. Discovery commenced.

On June 12, 2013, Lead Plaintiff served the HCA Defendants with their First Set of Requests for Production of Documents. More than half of the 58 Requests have nothing to do with what revenue trends were known at the time of the IPO or what caused the second quarter 2011 results. Instead, Lead Plaintiff's First Requests focused on the "facts" reported on by the

6

*New York Times*, documents concerning potentially unnecessary cardiac procedures and related internal documents, and documents produced to the government relating to the investigation mentioned in the *New York Times* article. *See* Saham Decl. Ex. 2 at Request Nos. 1-26; Pl's Mot. at 5-6 (summarizing 26 Requests in six bullets). Lead Plaintiff's motion does not satisfy its burden to demonstrate the relevancy of these documents and should be denied. *Steede v. Gen. Motors, LLC*, 2:11-CV-02351-STA, 2012 WL 6846529, at *4 (W.D. Tenn. Nov. 2, 2012) *aff'd*, 11-2351-STA-DKV, 2013 WL 142484 (W.D. Tenn. Jan. 11, 2013). ( "Once an objection to the relevance of the information sought is raised, the burden shifts to the party seeking the information to demonstrate that the requests are relevant to some claim or defense in the pending action.").

## III. THE ADDITIONAL DISCOVERY SOUGHT IS IRRELEVANT TO THE SURVIVING CLAIMS AND ISSUES IN THE CASE

In order for Lead Plaintiff to prevail on its Item 303 claim, it must prove that HCA failed to inform investors of a "known trend[]" that it "reasonably expect[ed]" would have a "material … unfavorable impact on … revenues or income from continuing operations."[5] 17 C.F.R. § 229.303(a)(3)(ii); Order at 6. The Complaint alleges that a material unfavorable impact is reflected in HCA's financial results for the second quarter of 2011, and in particular the decline in high-margin Medicare revenue components. Compl. ¶¶ 44-46. Discovery relevant to this claim concerns: (1) what caused the second quarter decline, (2) did the HCA Defendants know about these causes by March 9, 2011, and (3) did HCA expect these circumstances to impact

---

[5] Lead Plaintiff's Item 303 claims regarding the HCA Defendants' failure to disclose declining trends in Medicaid revenues per admission "barely survive[d] dismissal," Order at 13, as did their claims regarding the accounting treatment of HCA's pre-IPO transactions in 2006 and 2010, but those claims are not at issue in this Motion. Tellingly, however, only 20% (12) of Lead Plaintiff's 58 Requests seek discovery relating to those issues. *See* Saham Decl. Ex. 2. Lead Plaintiff's suggestion that the investigation reported on by the *New York Times* article is relevant to Defendants' knowledge of a trend in Medicaid revenues per admission is incorrect. Pl's Mot. at 3. Despite HCA's lower than expected earnings in the second quarter of 2011, HCA's Medicaid revenue per admission actually *increased* during this period. *See* excerpt of Transcript, Q2 2011 Conference Call (July 25, 2011) attached as Exhibit 1 ("Medicaid same-facility revenue per equivalent admission increased 1.9% excluding EPL").

future financial results. The HCA Defendants have agreed to produce the documents dealing

with these issues, including any such documents that deal with the impact of medically

unnecessary cardiac procedures.[6]

Lead Plaintiff is seemingly uninterested in this information. Instead, without connecting

them to its surviving Item 303 claim, Lead Plaintiff seeks documents regarding alleged internal

investigations and government inquiries, reported by the *New York Times* to be "thousands of

pages of confidential memos, e-mail correspondence among executives, transcripts from

hearings and reports from outside consultants." Pl's Mot. at 5 (citing Request Nos. 16-17, 22-

26). This information is absolutely irrelevant to Lead Plaintiff's Item 303 claim unless, as an

initial matter, the performance (or non-performance) of unnecessary cardiac procedures at a

handful of hospitals in 2010 contributed to the second quarter decline in high margin Medicare

components and was reasonably expected to at the time of the March 9 IPO. *See S.E.C. v.*

*BankAtlantic Bancorp, Inc.*, 285 F.R.D. 661 (S.D. Fla. 2012) (documents sought regarding

individual internal loan grades were irrelevant to show whether defendants failed to disclose a

known trend in extending and/or downgrading a material number of loans under Item 303 of

Regulation S-K). The HCA Defendants do not dispute that HCA voluntarily investigated

allegations raised by a nurse (C.T. Tomlinson) in 2010, and that the government is conducting an

---

[6] For example, the HCA Defendants' forthcoming productions will include information known to management in the first and second quarters of 2011 relating to: (1) changes in cardiac procedures or services "affecting a shift in service mix from more complex surgical cases to less acute medical cases in the second quarter of 2011"; (2) the "financial impact on HCA's revenue, if any, resulting from a decline in the frequency of high-margin cardiac-related procedures;" and (3) the "effect, if any, on HCA's revenue from changing demand for cardiovascular services." *See* Saham Decl., Ex. 3, Defs' Resps. to Requests No. 1, 2, 7, 9. Defendants have not "arbitrarily limit[ed]" the time period of production of "critical financial documents" or "historical financial data," as Lead Plaintiff contends. Pl's Mot. at 6 n.3. Plaintiffs allege that certain positive revenue annual trends (as of December 31, 2010) had reversed and were declining by the March 9, 2011 IPO. Consequently, discovery related to time periods preceding the first quarter of 2011 is, for the most part, irrelevant to the Item 303 omission claims. Where appropriate, for example with respect to budgeting and forecasting for 2011, Defendants have agreed to produce documents from the fourth quarter of 2010. *See, e.g.,* Saham Decl., Ex. 3, Defs' Resps. to Request No. 11 (agreeing to produce responsive, non-privileged documents as may be available for the fourth quarter of 2010 relating to HCA's revenue from cardiovascular services and the effect on such revenue or Medicare CMI, if any, of fewer cardiac-related procedures being performed, including corporate budgets, forecasts, and analysis of financial results).

8

inquiry into reviews assessing the medical necessity of interventional cardiology services provided at a small number of hospitals in Florida. *See* HCA 2012 Form 10-K at 55, excerpt attached as Exhibit 2; 1Q 2013 Form 10-Q at 16, excerpt attached as Exhibit 3.[7] But what matters for this case is whether any of those circumstances caused a "materially unfavorable impact" that HCA reasonably expected on March 9, 2011. That inquiry necessarily begins with an examination of what caused the "unfavorable impact" that HCA disclosed in July 2011 and that gave rise to this case.

The HCA Defendants do not contend that the Court should conclude now that Lead Plaintiff could never demonstrate that information underlying the 2010 investigation reported on by the *New York Times* is relevant. Rather, the HCA Defendants' position is that discovery should initially focus on the causes of the second quarter results and what the HCA Defendants knew and expected on March 9, 2011 about those causes. If, as the HCA Defendants believe the facts will demonstrate, a decline in medically unnecessary cardiac procedures did not contribute to the decline in Medicare revenue growth in the second quarter of 2011, and no one reasonably expected these procedures to impact future revenue results at the time of the IPO (after all, there was no reported decline in high-margin Medicare revenue components prior to the IPO or in the first quarter of 2011),[8] Lead Plaintiff will not need the expansive and burdensome discovery it seeks on this motion. However, after conducting this discovery, if Lead Plaintiff can point to

---

[7] Each disclosing: "In July 2012, the Civil Division of the U.S. Attorney's Office in Miami requested information on reviews assessing the medical necessity of interventional cardiology services provided at any Company facility (other than peer reviews). The Company is cooperating with the government's request and is currently producing medical records associated with particular reviews at eight hospitals, located primarily in Florida. At this time, we cannot predict what effect, if any, the request or any resulting claims, including any potential claims under the federal FCA [False Claims Act], other statutes, regulation or laws, could have on the Company."

[8] While theoretically possible, it is implausible that the discontinuation of the performance of certain cardiac procedures by some physicians at a handful of hospitals in a single state out of HCA's nationwide 160 hospitals could constitute a corporate trend under Item 303 reasonably expected to have a material impact on future revenue, for a corporation that generated $8.063 billion in revenue in the second quarter of 2011 alone. Dkt. 100.4, 7/25/11 Form 8-K.

information demonstrating that medically unnecessary procedures or the cessation of such procedures constituted a material "trend" expected to impact Medicare revenue growth at the time of the IPO, then the issues referenced in the *New York Times* article may be relevant and the HCA Defendants could be required to produce information regarding those issues.

Thus, the question for the Court is whether Lead Plaintiff should be permitted to embark on an undoubtedly expensive and burdensome fishing expedition when it is indisputable that the information sought may be completely irrelevant to this action. *Surles v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007) ("Although a plaintiff should not be denied access to information necessary to establish her claim, neither may a plaintiff be permitted 'to "go fishing" …'"). The HCA Defendants respectfully submit that the more efficient and efficacious approach is to limit discovery in this initial stage to the causes of the second quarter 2011 financial results and what the HCA Defendants knew and expected at the time of the IPO.

## IV. JUDGE SHARP'S ORDER DOES NOT ENTITLE LEAD PLAINTIFF TO DISCOVERY TO DEVELOP ISSUES OR CLAIMS NOT YET IN THIS CASE

Lead Plaintiff's reliance on Judge Sharp's Order (and specifically a single footnote therein) to support its contrary approach to discovery is unavailing. As Lead Plaintiff concedes, the documents sought relate to the events reported by the *New York Times* that Lead Plaintiff was denied leave to add to its Complaint. But Lead Plaintiff has "no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings." *New Hampshire Ins. Co. v. Blackjack Cove, LLC*, 3:10-0607, 2013 WL 393462, at *2 (M.D. Tenn. Jan. 31, 2013) (quotation and citation omitted); *see also* Fed. R. Civ. P. 26(b)(1) advisory committee's note on 2000 amendments ("The Committee intends that the parties and the court focus on the actual claims and defenses involved in the action."); Order at 14 n.4 (observing that the facts from the *New York Times* article are "not specifically pled in the Complaint.").

10

Instead, Lead Plaintiff leans on Judge Sharp's recognition that the existence of the *New York Times* article "underscores that there *may be* evidence that HCA had knowledge, and decided to discontinue certain practices which may have been of concern to investors." Order at 15 n.4 (emphasis added).[9] But Judge Sharp merely acknowledged the possibility that the performance (or non-performance) of cardiac procedures contributed to the decline in Medicare revenue growth in the second quarter of 2011 and thus *could* be relevant to Plaintiffs' Item 303 claim—precisely the inquiry that the HCA Defendants suggest is appropriate. Contrary to Lead Plaintiff's belief, Judge Sharp's Order does not (and could not) confirm that the "discontinuation of highly profitable cardiology procedures" is a "central issue[] to be tried." Pl's Mot. at 3. Those issues are not yet in the case and thus not within the proper scope of Rule 26. *Kane v. Metcalf*, 3-10-0206, 2012 WL 983589, at *2 (M.D. Tenn. Mar. 19, 2012) (Griffin, M.J.) (holding that Rule 26(c) limits the scope of discovery and "precludes matters bearing on issues that may be, but are not yet, in the case.").

## V. THE ADDITIONAL DISCOVERY SOUGHT IS OBJECTIONABLE AND OVERLY BROAD

In the event the Court finds any of the discovery requested by Lead Plaintiff relevant to its remaining Item 303 claim at this stage in discovery, the six categories of documents sought in Lead Plaintiff's motion are subject to valid objections and any discovery compelled should reflect those objections.

---

[9] Lead Plaintiff redacted the word "DOJ" from its quotation of Judge Sharp's Order. Pl's Mot. at 3. The actual quote is: "The Court recognizes that this assertion is not specifically pled in the Complaint. It does, however, amplify what is specifically alleged, to wit, that '[t]he cardiovascular service line was very important to HCA because it 'carries a better-than-average profitability,'' and that HCA was aware of the findings of the ***DOJ*** investigation prior to the initial public offering." Order at 14-15 n.4 (emphasis added). The missing word is significant. Judge Sharp concluded that the *New York Times* article could amplify the HCA Defendants' awareness prior to the IPO of the DOJ's investigation—a specifically pled allegation—*not* HCA's internal investigation referenced in the *New York Times* article. Notably, the *New York Times* did not suggest that high-margin Medicare revenue components were inflated prior to the March 9 IPO or amplify the allegation that a declining "trend" in such components existed in the first quarter of 2011.

*First*, a large amount of the documents Lead Plaintiff seeks are HCA's confidential

investigative materials, which are protected by the attorney-client privilege, attorney work

product doctrine, and/or peer review privileges (*see* Pl's Mot. at 5-6, Categories 1, 2, 3, 5).  HCA

has not waived these protections in any respect and HCA objects to the production of these

documents.  Lead Plaintiff's contention that HCA produced to the government "confidential

memos, e-mail correspondence among executives, transcripts from hearings and reports from

outside consultants" is based on the *New York Times* article but is wrong.  Pl's Mot. at 5.  The

*New York Times* article says nothing about what HCA produced to the government.  It merely

references its *own* "review of those communications."  *See New York Times* article (Saham Ex.

1) at 4.  The HCA Defendants do not know what the *New York Times* reviewed and Lead

Plaintiff should bring that matter up with the *New York Times*.  HCA has already described the

materials it produced to the government:

> In July 2012, the Civil Division of the U.S. Attorney's Office in Miami requested
> information on reviews assessing the medical necessity of interventional
> cardiology services provided at any Company facility (other than peer reviews).
> The Company is cooperating with the government's request and is currently
> producing medical records associated with particular reviews at eight hospitals,
> located primarily in Florida.  At this time, we cannot predict what effect, if any,
> the request or any resulting claims, including any potential claims under the
> federal FCA [False Claims Act], other statutes, regulations or laws, could have on
> the Company.

Exh. 3, 1Q 2013 Form 10-Q at 16.  HCA respectfully submits that Lead Plaintiff's expansive six

categories of information should be narrowed to include only the documents described by HCA.

*Second*, the documents that have "already been produced to governmental investigators"

(Pl's Mot. at 5, Category 4) include patient medical records that HCA believes are protected

under HIPAA and/or other privacy protections.  Any production of these materials must be

subject to these regulatory restrictions.  *Finally*, Lead Plaintiff's last category is overly broad and

vague (*see* Pl's Mot. at 6, Category 6).  Documents from 2008 and 2009 are irrelevant to Lead

Plaintiff's claim of a declining "trend" in Medicare revenue known by the first quarter of 2011.

Also, while Lead Plaintiff seeks data regarding cardiac procedures, it does not distinguish

between payors or define what constitutes a "cardiac procedure."

 Accordingly, without conceding the relevancy of such materials, in the event the Court

compels any of the discovery sought in Lead Plaintiff's six categories, it should be limited to:

(1) documents provided by HCA to the government in response to the July 2012 inquiry from the

Miami United States Attorney's Office "associated with particular reviews at eight hospitals"

"assessing the medical necessity of interventional cardiology services," Exh. 3, 1Q 2013 Form

10-Q at 16, subject to HCA's obligations under HIPAA and other privacy regulations, and (2)

documents from the period January 1, 2010 through June 30, 2011 sufficient to demonstrate (a)

the number of, and (b) Medicare revenue generated from, cardiac procedures performed at: (i)

the eight hospitals from which documents were produced to the government, and (ii) the

Company as a whole; subject to the parties' agreement on the definition of a "cardiac

procedure."[10]

## VI. CONCLUSION

 For the reasons set forth above, the HCA Defendants respectfully request that the Court

deny the relief requested in Lead Plaintiff's Motion to Compel.

---

[10] Moreover, Lead Plaintiff's proposed "seven day" deadline for the production of the requested documents  imposes an unnecessary and undue burden, in particular in light of the January 31, 2014 deadline for Defendants' substantial completion of document production.   *See* CMC Order #1.

13

Dated: August 14, 2013

Respectfully submitted,

s/ Steven A. Riley

Steven A. Riley
James N. Bowen
Milton S. McGee, III
Riley Warnock & Jacobson, PLC
1906 West End Avenue
Nashville, Tennessee 37203
(615) 320-3700
sriley@rwjplc.com
jimbowen@rwjplc.com
tmcgee@rwjplc.com

Everett C. Johnson, Jr.
Michele E. Rose
J. Christian Word
LATHAM & WATKINS, LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004-1304
(202) 637-1008
Everett.johnson@lw.com
Michele.rose@lw.com
Christian.word@lw.com

*Attorneys for Defendants HCA Holdings, Inc., Hercules Holdings II, LLC, Richard M. Bracken, R. Milton Johnson, Christopher J. Birosak, John P. Connaughton, James D. Forbes, Kenneth W. Freeman, Thomas F. Frist, III, William R. Frist, Christopher R. Gordon, Michael W. Michelson, James C. Momtazee, Stephen G. Pagliuca and Nathan C. Thorne*

14

## CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing document was made upon the following Filing Users through the Electronic Filing System:

**Counsel for Plaintiffs:**

George E. Barrett
Douglas S. Johnston, Jr.
Timothy L. Miles
BARRETT JOHNSTON, LLC
217 Second Avenue, North
Nashville, TN 37201-1601
T: (615) 244-2202
F: (615) 252-3798
gbarrett@barrettjohnston.com
djohnston@barrettjohnston.com
tmiles@barrettjohnton.com

Paul Kent Bramlett
Robert P. Bramlett
BRAMLETT LAW OFFICES
P.O. Box 150734
Nashville, TN 37215
T: (615) 248-2828
F: (615) 254-4116
pknashlaw@aol.com
robert@bramlettlawoffices.com

Francis A. Bottini, Jr.
BOTTINI & BOTTINI, INC.
7817 Ivanhoe Avenue
Suite 102
La Jolla, CA 92037
T:  (858) 914-2001
F:  (858) 914-2002
fbottini@bottinilaw.com

D. Seamus Kaskela
David M. Promisloff
Adrienne O. Bell
KESSLER TOPAZ MELTER & CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087
T: (610) 667-7706
F: (610) 667-7056
skaskela@ktmc.com
dmp@weiserlawfirm.com
abell@ktmc.com

15

Darren J. Robbins
David C. Walton
Catherine J. Kowalewski
Robert R. Henssler, Jr.
James I. Jaconette
Scott H. Saham
Robert K. Lu
Francis A. DiGiacco
Debra J. Wyman
ROBBINS GELLER RUDMAN & DOWD
LLP
655 West Broadway
Suite 1900
San Diego, CA 92101
darren@rgrdlaw.com
davew@rgrdlaw.com
katek@rgrdlaw.com
bhenssler@rgrdlaw.com
jamesj@rgrdlaw.com
scotts@rgrdlaw.com
RLu@rgrdlaw.com
fdigiacco@rgrdlaw.com
debraw@rgrdlaw.com


this 14th day of August, 2013.

s/ Steven A. Riley