# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **KARSTEN SCHUH, Individually and on Behalf of All Others Similarly Situated,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **No. 3:11-01033** **Consolidated Class Action** |
| **HCA HOLDINGS, INC., et al.,** | ) ) | **Judge Sharp** |
| **Defendants.** | ) | |

## MEMORANDUM

This matter is before the Court on the Lead Plaintiff New England Teamsters & Trucking Industry Pension Fund's ("Pension Fund's") Motion for Class Certification. (Docket No. 159). The Court heard oral arguments on the Motion on August 7, 2014. Having considered those arguments, as well as the arguments raised in the extensive briefing that has been submitted (Docket Nos. 159-1, 198, 235 & 247), the Court will grant the motion for class certification but place temporal limits on the class period.

## I. BACKGROUND

The factual allegations underlying this dispute are discussed in some detail in this Court's prior opinion resolving the HCA Defendant's Motion to Dismiss, Schuh v. HCA Holdings, Inc., 947 F. Supp.2d 882 (M.D. Tenn. 2013), familiarity with which is assumed. The Court will summarize some of the pertinent factual allegations and the parties' respective positions in order to place the present arguments in context.

This case is a consolidation of three securities actions brought on behalf of all persons who acquired common stock of HCA Holdings, Inc. ("HCA") "traceable to" an allegedly false and

misleading Registration Statement and Prospectus ("Registration Statement") issued in connection with HCA's March 9, 2011, initial public offering ("IPO"). The IPO involved the sale of more than $4.3 billion shares of HCA common stock. Defendants include HCA, its directors who signed the Registration Statement, the investment banks which underwrote the IPO, and Hercules Holdings II, LLC, the controlling shareholder of HCA.

In early 2011, HCA filed a Registration Statement with the Securities and Exchange Commission ("SEC") in connection with the planned stock sale. On March 9, 2011, the SEC declared effective HCA's Registration Statement for its initial public offering of 145.1 million shares of stock at $30 per share.

According to Plaintiff, the Registration Statement was false and misleading because it omitted certain material facts. That document allegedly failed to disclose (among other things[1]) that HCA (1) was experiencing and would continue to experience a decline in high margin components of Medicare Revenue, including cardiology revenue; (2) was experiencing declining Medicaid Revenues per admission; and (3) had violated Generally Accepted Accounting Principles ("GAAP") by improperly accounting for its reorganization transactions.

In moving to certify a class, Plaintiff focuses on HCA's high margin cardiology procedures which Plaintiff claims "accounted for about 25% of Medicare inpatient revenue and was one of HCA's most highly profitable segments." (Docket No. 235 at 4). It contends that revenues from the cardiology procedures line were declining in the quarters immediately prior to the IPO. Plaintiff also asserts HCA knew about the decline, and knew that the decline was likely to continue "[a]s a

_____

[1] In its prior opinion, the Court dismissed Plaintiff's allegations that HCA unlawfully failed to disclose (1) an adverse trend in Medicaid revenue growth; (2) the potential impact on revenue of proposed Medicaid legislation in Florida and Texas; and (3) an adverse trend in Medicaid Supplemental UPL payments from Texas.

result of HCA's internal reporting, its own internal investigation, and the DOJ investigation of cardiac billing practices." (Id.).

According to Plaintiff, HCA's own investigation showed that unnecessary cardiac procedures were being routinely performed. In fact, "[b]y the fall of 2010, HCA had uncovered evidence showing that 'cardiologists at several of its hospitals in Florida were unable to justify many of the procedures they were performing,'" and, at one Florida hospital, "'about half the procedures, or 1,200, were determined to have been done on patients without significant heart disease." (Id.) (citations omitted). Internal documents allegedly painted an equally dismal projection, so much so, that in October 2010 Defendants "internally lowered HCA's 2011 EBITDA[2] growth targets by almost 60%." (Docket No. 235 at 7). The DOJ investigation expanded to include at least 10 HCA hospitals.

In response to the Motion to Certify, HCA argues that "[p]rior to the IPO, HCA was not a typical private company." (Docket No. 198 at 3). While the "IPO signaled HCA's reemergence as a public company after nearly four and a half years of being closely held by a limited group of investors and management," it issued public debt in 2006 and 2010, and registered its common shared with the SEC in April 2008. (Id.). By registering its shares, HCA subjected itself to the reporting requirements of the Exchange Act, and "HCA filed annual and quarterly reports on Forms 10-K and 10-Q, as well as Form 8-Ks announcing major events (e.g., the issuance of new debt)." (Id.). HCA also held quarterly earnings calls and, during some of those calls, made detailed disclosure regarding its Medicaid and Medicare revenues, thereby disclosing some of the facts (including declines in the last quarter of 2010 and the first quarter of 2011) about which "Plaintiff

---

[2] "Earnings Before Interest, Taxes, Depreciation and Amortization."

now complains HCA failed to tell investors." (Id. at 4).

Defendant further notes that this case primarily concerns healthcare services provided by HCA and reimbursed by the government through its Medicare and Medicaid programs. Such "programs are highly regulated and require providers such as HCA to report a variety of data to the Centers on Medicare & Medicaid Services ('CMS') and the National Cardiovascular Data Registry ('NCDR')." (Id.). As a consequence, even before the IPO, "voluminous data regarding the services at issue was publicly available from federal and private data sources." Id.

After the IPO, on July 25, 2011, HCA reported its results for the second quarter of 2011, announcing that total revenues and same facility equivalent admissions for the second quarter of 2011 had increased 4% and 1.9%, respectively, compared to the second quarter of 2010. It also reported, however, that HCA had experienced an unexpected "'shift in service mix from more complex surgical cases to less acute medical cases,' which 'resulted in lower than anticipated revenue growth and earnings over the same quarter in 2010.'" (Id. at 9, citation to SEC filings omitted). On September 12, 2011, HCA again reported on its second quarter results, explaining, among other things, that "Medicare revenue growth in particular 'fell short of expectations and was inconsistent with historical trends,'" and that while "'[o]verall demand for cardiovascular services has been declining about 3% per year for several years[, it] [a]ppears to be an acceleration of this negative trend nationally that impacted HCA markets in Q2 2011.'" (Id., citation to SEC filings omitted).

Shortly after the update, on October 1, 2011, BARRON'S published an article in which the authors questioned HCA's accounting for the 2006 recapitalization and the 2010 reorganization, and opined that HCA utilized "pooling-of-interest" accounting instead of the "purchase method" of

accounting for those "combined business" transactions. By October 3, 2011, HCA's stock had declined to $18.81, a decline of 38% from the IPO offering price. This lawsuit followed.

The Pension Fund purchased 55,175 shares of HCA stock between March 9, 2011 and July 25, 2011 as part of a portfolio managed by Victory Capital Management ("Victory"). Plaintiff moves the Court to certify a class consisting of "[a]ll persons who acquired the common stock of HCA Holdings, Inc. ('HCA' or the 'Company') traceable to the Registration Statement and Prospectus (collectively the 'Registration Statement') utilized in connection with HCA's March 9, 2011 initial public offering ('IPO') and were damaged thereby[.]" (Docket No. 159-1 at 1).

## II. LEGAL ANALYSIS

Rule 23 of the Federal Rules of Civil Procedure sets forth a two-step process to determine the propriety of maintaining a class action. First, a party seeking class certification must meet the four requirements under Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a). Second, after satisfying Rule 23(a), a party must show that it falls within one of Rule 23(b)'s three categories. Here, the Pension Fund seeks certification under Rule 23(b)(3), which allows a court to certify a class only after finding that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

A district court has broad discretion to certify a class, but it must "rigorous[ly] analy[ze]" whether Rule 23's elements are met. Reeb v. Ohio Dep't of Rehab., 435 F.3d 639, 644 (6th Cir. 2006). While a court may generally accept a complaint's allegations as true, it may sometimes need to "'probe behind the pleadings'" before deciding the certification issue. Pilgrim v. Universal

Health Card, LLC, 660 F.3d 943, 949 (6th Cir. 2011) (quoting Gen. Tel. Co. v. Falcon, 457 U.S. 147, 161 (1982)).  Moreover, "rigorous analysis" may well "entail some overlap with the merits of the plaintiff's underlying claim."  Wal-Mart Stores, Inc. v. Dukes, 131S. Ct. 2541, 2551 (2011).

HCA argues that class certification in this action is inappropriate for three reasons.  First, the Pension Fund cannot show that common questions of law or fact will predominate over individual issues as required by Rule 23(b).  Second, the Pension fund is subject to a unique defense that renders it inadequate and atypical under Rule 23(a).  Third, the proposed class definition is impermissibly overbroad.  The Court considers the arguments in turn.

## A.  Common Issues and Predominance

As noted, Plaintiff's claims are brought under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933.  Section 11 prohibits misstatements and omissions in a Registration Statement, that is, the document filed with the SEC in order to register securities for sale to the public.  15 U.S.C. § 77k.  "Sections 12 and 15 are essentially derivative of Section 11 claims," New Jersey Carpenters Health Fund v. Rali Series 2006-QO1 Trust 477 F. App'x 809, 812-813 (2nd Cir. 2012), because Section 12 prohibits oral misstatements and omissions, or misstatements and omissions in the prospectus which is a part of the Registration Statement,  15 U.S.C. § 77l(a)(2), while Section 15, in turn, provides secondary liability for persons who control others, 15 U.S.C. §77o.

"Sections 11 and 12 both impose a duty to disclose additional facts when a statement of material fact made by the issuer is misleading, and they both impose liability for failing to fulfill that duty of disclosure, as well as for misstating a material fact." J&R Mktg., SEP v. Gen. Motors Corp., 549 F.3d 384, 390 (6th Cir. 2008).  Even though Section 11 (and derivatively Section 12) "provide purchasers with a form of strict liability for material misstatements or omissions, . . . it also affords

certain affirmative defenses[:]

> Section 11 absolves defendants of liability for misstatements or omissions if "it is proved that at the time of such acquisition [the purchaser] knew of such untruth or omission." 15 U.S.C. § 77k(a). A plaintiff's knowledge is therefore an affirmative defense under Section 11. In re Initial Pub. Offering Sec. Litig., 483 F.3d 70, 73 n. 1 (2nd Cir. 2006). Section 12(a)(2) similarly imposes liability for untruths or omissions only where the purchaser did not know "of such untruth of omission." 15 U.S.C. § 77l(a)(2).

Fed. Hous. Finan. Agency v. UBS Am.'s Inc., 2013 WL 3284118, at *13 (S.D.N.Y. June 28, 2013).

The Pension Fund argues that trial of this case "will focus almost entirely on common issues, including evidence of the Registration Statement's failure to disclose facts relating to high margin components of HCA's cardiology business line." (Docket No. 235 at 4). More specifically, whether HCA was aware prior to the March 9, 2011 IPO that its cardiology product line had experienced significant declines in 2010 and the first two months of 2011, whether this decline (if true) was material, and whether HCA disclosed the trend is common to all class members.

HCA argues that the defense of knowledge will predominate, and it "is entitled to individualized demonstrations of proof and jury determinations as to each class member's knowledge." (Docket No. 198 at 7). In this regard, HCA argues that the "[p]utative class members had multiple opportunities to acquire varying levels of 'knowledge' regarding the information allegedly misstated and/or omitted from the Registration Statement that forms the basis of Plaintiff's remaining claims," including (1) HCA's accounting for the 2006 and 2010 transactions; (2) the alleged trends in Medicaid revenue per admission; and (3) the alleged trends in Medicare revenues and cardiology services. (Id. at 9). Thus, and "[g]iven the wealth of publicly-available information regarding the very facts Plaintiff claims were omitted and/or misrepresented, it is impossible for Plaintiff to prove that common issue will predominate over the mini trials into what each investor

knew prior to its purchase(s) of HCA stock in the IPO or secondary market." (Id. at 12).

"In securities class action cases, the crucial requirement for class certification will usually be the predominance requirement of Rule 23(b)(3)." Halliburton Co. v. Erica P. John Fund, Inc. (Halliburton II), 134 S. Ct. 2398, 2411 (2014). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 632 (1997). "To satisfy the predominance requirement in Rule 23(b)(3), 'a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof.'" Beattie v. CenturyTel, Inc., 511 F.3d 554, 564 (6th Cir. 2007) (quoting, In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 136 (2nd Cir. 2001)).

The Supreme Court has held that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." Windsor, 521 U.S. at 625. But it has also stated on several occasions, including in the securities class action context, that "plaintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)." Halliburton II, 134 S. Ct. 2411 (emphasis in original) (citing, Dukes, 131 S. Ct. 2541, 2551–52; Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1431–32 (2013)).

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." Erica P. John Fund, Inc. v. Halliburton Co. (Halliburton I), 131 S. Ct. 2179, 2184 (2011). "If a plaintiff purchased a security

issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case." Herman & MacLean v. Huddleston, 459 U.S. 375, 382 (1983). "Liability against the issuer of a security is virtually absolute, even for innocent misstatements." Id. see also In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 359 (2nd Cir. 2010) (stating that elements for a Section 11 claim are that (1) plaintiff purchased a registered security; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement contained untrue statements or contained omissions of material fact and that "[c]laims under sections 11 and 12(a)(2) are ... Securities Act siblings with roughly parallel elements").

Here, Plaintiff points to documentary evidence which arguably suggest that there was a significant decline in the high margin revenue for cardiology procedures in the period before the IPO, that overall HCA's performance was not promising and there was little growth rate, that HCA facilities performed unnecessary cardiac procedures, and that HCA was aware of these things and others, but did not disclose them. Just by way of examples:

▸ Internal documents showed that during 2010, same facility inpatient cardio surgery admissions volume declined 7.6% ; elective cardiology volume declined over 10%; managed care cardiology volume declined over 8%. Further, cardiology surgical admissions declined in each of the 14 months immediately preceding the IPO and continued to worsen immediately prior to the IPO.

▸ Emails between HCA executives from late 2010 and into early 2011 contained language remarking on poor performance, including: "[w]hat is really bothering me here is the trend of 'accelerating rate of decline'; "[t]he results are awful; "December was really bad; [n]ot a lot of good news out there"; "[t]hese trends are disturbing; "[w]eak surgical volume . . . why? Zero cases in the cath lab"; "[w]eak surgical trends continue; and "[y]ear over year comparisons terrible."

▸ Prior to the IPO, HCA contracted with AllMed, a peer review firm which retained board certified cardiologist to review cardiac procedures performed by numerous HCA cardiologists for medical necessity. AllMed reviewed hundreds of cardiac

9

procedures between 2008 and 2010 and concluded prior to the IPO that a significant percentage of them were performed when "indications were lacking for the procedure" and/or where "there [was] evidence and/or general agreement that the procedure [was] not useful/effective and in some cases might be harmful." For example, a sampling of one of HCA's largest cath lab indicated that 24% of PCI stents[3] failed to meet the standard of care, and that a second representative sample showed that stenting was not necessary in 21% of the cases. A similar all PCI-Stents performed at the HCA Fairview Park Cath Lab during 2009 and 2010 showed that one of the two interventional cardiologists at the facility performed 50% of his procedures on patients where "there was no clear indication."

‣ Prior to the IPO, the Company disseminated checklists to its cardiologists in order to insure that the regularized performance of unnecessary procedures would cease and only appropriate procedures would be performed going forward. For example, on December 1, 2010, a letter and checklist regarding AICDs[4] (one of HCA's highest margin cardiac procedures) was sent to all HCA cardiologists in order to ensure that these procedures would only be performed when appropriate diagnostic criteria were met. Immediately following the dissemination of this checklist, AICD procedure volume declined approximately 12%. Additional check lists were disseminated with respect to PCI-Stents.

‣ Just months after the IPO, on July 25, 2011, HCA disclosed poor results along with the explanation that HCA had "experienced a shift in service mix from more complex surgical cases to less acute medical cases." The reasons for the poor results was amplified in a call with analysts on September 12, 2011, where HCA explained that the shift in service mix was primarily attributed to the cardiology service line, admitting such things as "[i]n 2010 AICD volume declined in the 3-4% range each quarter"; "cardiovascular surgical cases" which included "interventional" cardiology procedures "drove a decline in CMI."[5] Further, an internal discussion with the board of directors prior to this call indicated that "[c]ardiovascular related procedures drove ~80% of loss in CMI and ~95% of lost surgical volume."

(Docket No. 235 at 6-11, internal citations to the record omitted).

Since "[t]he predominance inquiry must focus on common questions that can be proved through evidence common to the class," In re Whirlpool Corp. Front-Loading Washer Prod. Liab.

---

[3] "Percutaneous coronary intervention."

[4] "Automated Implantable Cardioverter-Defibrillator ."

[5] "Case Mix Index."

Litig., 722 F.3d 838, 858 (6th Cir. 2013), and since "materiality is an objective issue susceptible to common, classwide proof" Halliburton II, 134 S. Ct. at 2416, the Court finds that Plaintiff has established that there are key questions, common to the entire class, which are best answered in the class context. This includes (but is not necessarily limited to) whether, prior to March 9, 2011, HCA was aware – but failed to disclose– that its cardiology business line had experienced significant declines, that unnecessary cardiac procedures were being performed, and that HCA's overall performance was not as expected or predicted. It also includes whether such things, if true, were material.

Even though the question of predominance begins with the essential elements of the claim, this does not necessarily end the inquiry. As noted, Section 11 creates an affirmative defense where a defendant can prove that, at the time of purchase, the purchaser knew of the untruth or omission. 15 U.S.C. § 77k(a). "Because of its potential to defeat liability, investor knowledge is a relevant consideration during class certification." In re Kosmos Energy Ltd. Sec. Litig., 299 F.R.D. 133, 152 (N.D. Tex. 2014) (footnote omitted).

"Under the investor knowledge defense, claims brought pursuant to § 11 of the 1933 Act will not succeed where a defendant shows that 'the plaintiff knew of the untruth or omission at the time of his or her acquisition of the security.'" Id. (footnote and citation omitted). Nevertheless, "the fact that a defense may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones." Beattie, 511 F.3d at 564 (citation and internal quotation mark omitted)

Because "knowledge is an affirmative defense, not a required element of a Securities Act claim[,] [i]n order to defeat predominance on this basis, defendants must provide evidence that

certain class members had differing levels of knowledge regarding the misleading nature of the statements or omissions when they invested sufficient to outweigh common issues." In re IndyMac Mortgage-Backed Sec. Litig., 286 F.R.D. 226, 238 (S.D.N.Y. 2012). That is a defendant "must submit evidence showing the existence of individual investor knowledge sufficient to preclude a finding by the Court that 'common liability issues predominate over individual knowledge issues.'" In re Kosmos, 299 F.R.D at 152. "This proof need not be at the level required to prove the affirmative defense on the merits but must be adequate to satisfy the court at the certification stage that 'individual knowledge inquiries might be necessary.'" Id. at 152-53.

In opposing Plaintiff's Motion for Class Certification, HCA argues that "[p]utative class members had multiple opportunities to acquire varying levels of 'knowledge' regarding the information allegedly misstated and/or omitted from the Registration Statement that forms the basis of Plaintiff's remaining claims." (Docket No. 198 at 9).

With regard to the assertion based upon the BARRON'S article that HCA should have used the accounting method for business combinations for the 2006 recapitalization and 2010 reorganization, HCA argues the BARRON'S article was "based upon public information disclosed by HCA prior to its IPO." Thus, "[a]ny potential investor who read HCA's filing would . . . have had the same information as the authors of the BARRON'S article and could have reached the same conclusion about HCA's accounting." (Id. at 10).

As for the alleged trends in Medicaid revenue per admission, HCA assert that, while it did not disclose this metric in its public filing, it did report a decline in Medicaid revenue per admission during earning calls with investors in November 2010, February 2011 and May 2011. Thus, "[a]ny investor who listened to the calls or read the transcripts would have had knowledge of HCA's

Medicaid revenue per admission." (Id. at 10).

Finally, with regard to the allegation that HCA failed to disclose the decline in high margin components of Medicare revenues and, in particularly the declining volume in cardiology procedures (at least partly as a result of the DOJ investigation an internal concerns over cardiac catheterizations), HCA asserts that "[b]ecause Medicare is a government program, voluminous data regarding these procedures is publicly available." (Id.). Further, "[i]nvestors could have subscribed – as HCA did – to services such as Intellimed, which aggregate state data and market share research, or obtained information via" the National Cadiovascular Data Registry. (Id.).

More generally with respect to the availability of information, HCA argues:

> Certain investors (including Plaintiff via Victory) received some of this publicly available information directly from HCA or its underwriters during HCA's IPO roadshow. Although all of this information would have been *available* to any investor at the time from a range of public sources, differing levels of participation in these meetings would have inevitably resulted in differing levels of *actual knowledge* of this public information among different investors. As reflected in one schedule, there were several meetings and calls over the course of three weeks with potential large investors and investment advisors. . . . In addition, many potential investors were given the opportunity to, and did, attend and/or view a presentation prepared by HCA and its bankers ("IPO Roadshow Presentation"). The presentation included publicly-available information about declining growth in cardiac service volume, both in the market and for HCA facilities.

(Id. at 12, internal citations omitted).

Having fully considered the matter, the Court is not convinced that the question of "knowledge" will predominate over the other common issues in this case. No doubt some, and maybe many of the investors were sophisticated (including, presumably, Victory), but "sophistication is not sufficient on its own to find that question of individual investor knowledge predominate over common issues." Pub. Emp'ee Retirement Sys. v. Goldman Sachs Group, Inc., 280 F.R.D. 130, 137 (S.D.N.Y. 2012) (collecting cases). "General investment sophistication of

certain class members does not show that any of the class members" had knowledge, "[n]or does it significantly tend to show that sophisticated investors had any reason to doubt [defendant's] statements[.]" Tsereteli v. Residential Asset Securitization, 283 F.R.D. 199, 2013 (S.D.N.Y. 2012). It is likely that most large IPOs will draw the attention of a gamut of investors – perhaps ranging from the neophyte to the expert – but certainly not all Section 11 cases cannot be the subject of class actions simply because some investors probably know more than others.

HCA's argues that investors "might have," "could have" or "would have" known certain things, and continues in its sur-reply by stating "that the information Plaintiff claims was omitted from the Registration Statement was publicly available and thus knowable by prospective class members." (Docket No. 247 at 4). "If courts held that merely available, as opposed to widely known, public information exposed an untruth or omission, thereby rendering it immaterial, they would effectively shift the burden of proof on § 11's affirmative defense, presuming that the plaintiff should have known the relevant information rather than requiring the defendant to prove actual knowledge." New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC, 709 F.3d 109, 127 n.12 (2nd Cir. 2013). This is not to say that Defendant must establish the merits of its affirmative defense at this stage; it is to say, however, that "the certification question [is] whether common liability issues predominate over individual knowledge defenses." Rali Series 2006-QO1 Trust, 477 F. App'x 814. Speculation "does not raise the concern of issues of individual knowledge predominating." In re U.S. Foodservice Inc. Pricing Litig., 2011 WL 6013551, at *11 (D. Conn. Nov. 29, 2011); see also, New Jersey Carpenters Health Fund v. DLJ Mortg. Capital, Inc., 2014 WL 1013835, at *10 (S.D.N.Y. Mar. 17, 2014) ( "Defendants' speculation that certain sophisticated investors may have had special knowledge" and that  active participants in the  would be subject to

individualized inquiries about their knowledge of origination practices does not "undermine a finding of predominance").

Moreover, in its opposition papers, HCA describes the supposedly "available" and "knowable" information in the most general of ways and, in response, Plaintiff finds it "telling" that HCA "do[es] not disclose the allegedly omitted information" by "quot[ing] from the language of these exhibits and websites[.]" (Docket No. 235 at 14). Plaintiff suggest that the undisclosed information is not what it is claimed to be and, in this regard, points to HCA's citation to the Roadshow presentation:

> The Road Show presentation itself misleadingly understates HCA's own decline in Cardiology claiming that "HCA Cardiac Growth (over prior 12 months) was -.77%" when high margin cardiology components were in fact declining at a rate between 1,000% and 2,000% greater than disclosed, that is at a rate of between 7.6 percentage points and 15.6 percentage points as compared to the less than 1% (-.77%) claimed by HCA in the Road Show. . . . This specific false representation of HCA's own cardiac performance undermines defendants' speculation about whether class members may have obtained knowledge of HCA's closely guarded operational results from general outside sources discussing nation-wide cardiac treatments.

(Docket No. 235 at 14).

No doubt, HCA will cast the Roadshow Presentation in an entirely different light and has its own take on what the earning calls, filings, Intellimed, and other "publicly" available information shows. But this dispute, while it may go to knowledge, also goes to materiality and whether the information was disclosed, both of which are issues common to the class. See, DLJ Mtg., 2014 WL at *8 (emphasis in original) ("Since the information was public, the knowledge inquiries for the investors in the 2006–5 and 2007–2 Offerings may be *different*, but they would not be *individualized*); New Jersey Carpenters Health Fund v. Residential Capital LLC., 2013 WL 6839093, at *4 (S.D.N.Y. Dec. 27, 2013) ("publicly available news stories do not create

individualized knowledge," and "even assuming that the news reports provided some knowledge to investors, this information is 'subject to generalized proof'").

## B. **Adequacy and Typicality**

The third requirement under Rule 23(a) requires Plaintiff to show to show that its claims and defenses are "typical of the claims and defenses of the class." Fed. R. Civ. P. 23(a)(3). "A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." <u>Beattie</u>, 511 F.3d at 561 (6th Cir. 2007) (internal quotation marks omitted). The requirement's operative purpose "is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." <u>Sprague v. Gen. Motors Corp.</u>, 133 F.3d 388, 399 (6th Cir. 1998) (en banc).

Rule 23(a)'s fourth requirement requires Plaintiff to show that it "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "'The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. A class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'" <u>Young v. Nationwide Mut. Ins. Co.</u>, 693 F.3d 532, 543 (6th Cir. 2012) (quoting <u>Windsor</u>, 521 U.S. 591 at 625–26. A "court looks to two criteria for determining adequacy of representation: '1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.'" <u>Id</u>. (quoting <u>In re Am. Med. Sys., Inc.</u>, 75 F.3d 1069, 1083 (6th Cir. 1996)).

In what is really an off-shoot of its predominance argument, HCA contends that Plaintiff cannot meet Rule 23(a)'s typicality and adequacy requirements because of the supposed

16

susceptibility of Victory to unique defenses. In fact, HCA claims that "Plaintiff, through Victory, has actual knowledge of HCA" because:

▸ Long before it considered investing in HCA's IPO, Victory was already familiar with HCA's business, having "purchased HCA bonds in 2006 and senior secured notes in 2010."

▸ "Victory engaged in an extensive due diligence process to determine if HCA was a good investment" and "assigned a dedicated Diversified Equity team with expertise in accounting and an analyst with expertise in the healthcare sector to analyze HCA through their proprietary top-down and bottom-up methods."

▸ "Victory actively participated in the IPO roadshow . . . which discussed publicly-available information, including, among other things, the potential impact of state budget cuts and declining growth in cardiac service volume, both in the market and for HCA facilities."

▸ "Victory continued to actively monitor HCA's operations and performance after the IPO. Victory subscribed to a service called FactSet, which was a repository for HCA transcripts, analyst reports, and filings. Victory also subscribed to several brokerage firms that followed HCA, and received reports directly from them, including from Baird, J.P. Morgan, Goldman Sachs, ISI, and Citigroup."

▸ Victory "listened to HCA's first quarter 2011 earnings call on May 4, 2011, during which HCA reported declining Medicaid revenue per equivalent admission" and "listened to HCA's second quarter 2011 earnings call on July 25, 2011, during which HCA announced lower-than-forecasted earnings, which HCA attributed in part to a shift in acuity." Nevertheless, "[a]fter learning this information, Victory continued to invest in HCA. Following HCA's May 4, 2011 disclosure of declining Medicaid revenue per admission, Victory made six HCA stock purchases for a total of 12,500 shares on Plaintiff's behalf. . . . On July 25, 2011, Victory made two purchases of HCA stock (totaling 6,500shares) — both after HCA had issued its press release[.]"

(Docket No. 198 at 15-17, internal citations omitted).

Though criticizing Plaintiff for relying on <u>Beach v. Healthways Inc.</u>, 2010 WL 1408791(M.D. Tenn., April 2, 2010) (Docket No. 198 at 14), HCA quotes that case in its opening brief for the proposition that "[c]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation."

Id. at *2.  However, in Healthways, Judge Campbell also observed:

> Mere communication with corporate insiders will not render a class representative atypical for class certification purposes absent the exchange of non-public information.  In re DVI, Inc. Securities Litigation, 249 F.R.D. 196, 203 (E.D. Pa. 2008).  Courts have consistently certified classes where there was no evidence that the named plaintiff received non-public information from a corporate officer. Id. at 202.  In general, the cases hold that if the plaintiff has received information from company insiders that confirms, reflects, repeats, or even digests publicly available market information, that plaintiff is an appropriate class representative.  Id.

Id. at 4.  And, as for adequacy, Judge Campbell wrote:

> Defendants allege that the Fund cannot adequately represent the interests of class members. On the current record, the Court finds no reason to believe that the Fund and/or its attorneys will not vigorously prosecute this litigation and supervise lead counsel. In addition, the Court finds no reason to believe that the Fund and/or its attorneys will operate under any conflict of interest or have divided loyalties.

Id.

Here, Victory has testified that it has received no non-public information about HCA and HCA offers nothing to the contrary.  It argues instead that whether Victory received non-public information is "beside the point" and "irrelevant" in this Section 11 case (Healthways was a 10b(5) case) because "Plaintiff's knowledge will preclude it from recovering under Sections 11 and 12, while other class members without that knowledge would not be barred from recovery[.]" (Docket No. 247 at 3).  HCA also argues that "Plaintiff cannot cite a single case holding that a class representative subject to a unique knowledge defense under Section 11 or 12 is typical." (Id. at 10).

While there might not be cases that hold a class representative who is subject to a "unique knowledge defense" is typical for purposes of a Section 11 or 12 case, there are cases that hold the mere fact that the representative may possess knowledge that other putative class members do not does not make that representative atypical or inadequate.  See, DLJ Morg., 2014 WL 1013835, at *6 (finding defendant's typicality argument based upon knowledge defense "unpersuasive" and

noting that "[e]ven if Lead Plaintiff is subject to affirmative defenses, those defenses would be far from 'unique' to Lead Plaintiff"); <u>Tseretli</u>, 283 F.R.D. at 210 n. 79 ("Asserted differences in knowledge between class members and lead plaintiffs, however, do not defeat adequacy. Credit Suisse cites to no legal support indicating otherwise, and provides no evidence in support of their argument indicating what knowledge it is that Vaszurele has that will provide a 'fundamental' conflict with other class members"); <u>In re Washington Mut. Mortgage-Backed Securities Litigation</u>, 276 F.R.D. 658, 666 (W.D. Wash. 2011) (rejecting "Defendant's suggest[ion] "that each named Plaintiff is atypical because they had 'specific knowledge of loan origination practices generally, and WMB's practice in particular'" where "Defendants have not provided any competent evidence the named Plaintiffs actually knew WMB or any Defendants disregarded the underwriting guidelines contrary to the statements made in the offering documents").

Here, the Pension Fund has claims that are typical of the class and HCA has not shown that Victory's purported knowledge – knowledge which itself HCA contends to be widespread – will become the focus of this litigation. Further, and just as in <u>Healthways</u>, the Court has no reason to believe that the Pension Fund and/or its attorneys will not vigorously prosecute this litigation, or be inadequate because of any conflict of interest.

**C.  <u>Ascertainability of Class</u>**

"Before a court may certify a class pursuant to Rule 23, the class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." <u>Young</u>, 693 F.3d at 537–38. "For a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria." <u>Id</u>.

HCA objects to the proposed class for two reasons. First, the class is overbroad because it contains no temporal limits. Second, Plaintiff's insertion of the phrase "and were damaged thereby" only adds to the problem because the Court would (a) have to determine whether a purchaser has been damaged in order to ascertain membership and (b) that phrase creates an impermissible "fail safe" class. See, id. at 538 (citation omitted) ("[A] "fail-safe" class is one that includes only those who are entitled to relief. Such a class is prohibited because it would allow putative class members to seek a remedy but not be bound by an adverse judgment—either those 'class members win or, by virtue of losing, they are not in the class' and are not bound.").

At oral argument, Plaintiff disputed whether inclusion of the "damaged thereby" phrase rendered the proposed class a "fail-safe" class, but conceded "the language can be deleted." (Docket No. 249, Trans. at 19). Plaintiff also conceded that, given the statutory damages formula set forth in Section 77k(e), the cut-off date for the class is the time of filing of this litigation which is October 28, 2011. The Court finds that, with those concessions, the class is readily ascertainable based upon objective criteria.

**D. Remaining Factors**

The remaining factors of the Rule 23 analysis are clearly met in this case.

Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impracticable." While "[t]here is no strict numerical test for determining the impracticability of joinder," In re Am. Med., 75 F.3d at 1079, the "sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only factor needed to satisfy Rule 23(a)(1)," Bacon v. Honda of Am., Mfg., Inc., 370 F.3d 565, 570 (6th Cir. 2004). This case involves the sale of millions of stock, and Plaintiff estimates that the number of purchasers is likely to be "in the

thousands" and that those purchasers reside in many states.

The second prerequisite of class certification is that the plaintiff must demonstrate that the class members' claims "depend upon a common contention . . . of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Dukes, 131 S. Ct. at 2251 (citation and internal quotation marks omitted). This requirement of commonality is met because the Court has already found that common issues predominate. See , DLJ Mtg., 2014 WL 1013835, at *8 (citation omitted) ("'The predominance criterion is, in effect, a stricter version of the commonality requirement of Rule 23(a)(2)'").

Finally, for a class to be certified, Plaintiff must show that a class action is the superior method to fairly and efficiently adjudicate this case. See Fed. R. Civ. P. 23(b)(3). "'The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.'" Young, 693 F.3d at 545 (quoting Amchem Prods., 521 U.S. at 617). Given Defendants' alleged violation of the federal securities law and its impact on a large number of geographically dispersed investor, a class action is the superior vehicle for adjudication of the claims. The alternative would be to have (potentially) thousands of individual actions, which is likely impractical for most investors, and which would risk burdening the judicial system.

## III. CONCLUSION

"[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently.'" Amgen Inc. v. Conn. Retirement Plans & Trust Funds, 133 S. Ct. 1184, 1191 (2013). In this case,

the Court finds that the best way to serve that office is to allow this case to proceed as a class action.

Accordingly, Plaintiff's Motion for Class Certification will be granted, although the Court will place temporal limits on the scope of the class.

An appropriate Order will be entered.

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE